THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
CHERYL O'CONNOR MURPHY (CA Bar No. 173897)
CURTIS A. KIN (CA Bar No. 187106)
ANTHONY J. LEWIS (CA Bar No. 231825)
Assistant United States Attorneys
        United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone:  (213) 894-0759/6772/1786
        Facsimile:  (213) 894-6269/6436/3713
        E-mail: cheryl.murphy@usdoj.gov
                curtis.kin@usdoj.gov
                anthony.lewis@usdoj.gov

Attorney for Plaintiff
United States of America

                   UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. CR 07-11(B)-MMM |
| | ) |
| Plaintiff, | ) <u>GOVERNMENT'S OMNIBUS RESPONSE</u> |
| | ) <u>TO SENTENCING POSITIONS OF</u> |
| v. | ) <u>DEFENDANTS GLADYS VASQUEZ</u> |
| | ) <u>VALENZUELA, MIRNA JEANNETH</u> |
| GLADYS VASQUEZ VALENZUELA, | ) <u>VASQUEZ VALENZUELA, MARIA DE</u> |
| MIRNA JEANNETH VASQUEZ | ) <u>LOS ANGELES VICENTE, MARIBEL</u> |
|   VALENZUELA, aka Miriam, | ) <u>RODRIGUEZ VASQUEZ, AND</u> |
| MARIA DE LOS ANGELES | ) <u>GABRIEL MENDEZ; EXHIBITS</u> |
|   VICENTE, aka Angela, | ) |
| ALBERTINA VASQUEZ | ) |
|   VALENZUELA, aka | ) |
|   Cristina, | ) |
| MARIBEL RODRIGUEZ VASQUEZ, | ) Hearing Date:  Aug. 17, 2009 |
| GABRIEL MENDEZ, | ) |
| LUIS VICENTE VASQUEZ, | ) Hearing Time:  1:15 p.m. |
|    aka Armando, | ) |
| FLOR MORALES SANCHEZ, and | ) |
| PABLO BONIFACIO, | ) |
| | ) |
| Defendant. | ) |

        Plaintiff, by and through its attorney of record, the United

States Attorney for the Central District of California, hereby

1   files this omnibus response to the sentencing positions filed by

2   defendants Gladys Vasquez Valenzuela, Mirna Jeanneth Vasquez

3   Valenzuela, aka "Miriam," Maria de los Angeles Vicente, aka

4   "Angela," Maribel Rodriguez Vasquez, and Gabriel Mendez.  For the

5   reasons set forth herein, the government maintains the position

6   set forth in its own sentencing brief, namely, that just and

7   reasonable punishment for each of these defendants is a lifetime

8   term of imprisonment, a five-year term of supervised release, and

9   a special assessment of $100 per charge of conviction.

10       The government's response is based upon the attached

11   memorandum of points and authorities, the Presentence Reports,

12   all the files and records in this case, and any such argument or

13   evidence that may be presented at any hearing on this motion.

14   Dated:  August 3, 2009          Respectfully submitted,

15                                   THOMAS P. O'BRIEN
                                     United States Attorney
16
17                                   CHRISTINE C. EWELL
                                     Assistant United States Attorney
                                     Chief, Criminal Division
18
19                                    /s/
                                     CHERYL O'CONNOR MURPHY
20                                   CURTIS A. KIN
                                     ANTHONY J. LEWIS
21                                   Assistant United States Attorneys

22                                   Attorneys for Plaintiff
                                     United States of America

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**PAGE(S)**

TABLE OF AUTHORITIES   . . . . . . . . . . . . . . . . . . .   iv

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . .   1

II.   THE SENTENCING GUIDELINES CALCULATIONS . . . . . . . . .   2

    A.   Summary of Defendants' Objections   . . . . . . . . .   2

    B.   Relevant Conduct: Co-Conspirators Are
       Responsible for All Jointly Undertaken
       Criminal Activity   . . . . . . . . . . . . . . . .   3

    C.   Evidence That Can Be Considered At Sentencing
       and The Burden of Proof   . . . . . . . . . . . .   5

    D.   Section 2A3.1 Applies to Each Defendant's
       Conduct . . . . . . . . . . . . . . . . . . . . .   9

    E.   Specific Offense Characteristics & Adjustments   . .   11

       1.   Use of Force [U.S.S.G. § 2A3.1(b)(1)]   . . . .   11

       2.   Age of Victims [U.S.S.G. § 2A3.1(b)(2)]   . . .   14

       3.   Care/Custody/Control
          [U.S.S.G. § 2A3.1(b)(3)] . . . . . . . . . .   20

       4.   Vulnerable Victim [U.S.S.G. § 3A1.1] . . . . .   26

       5.   Physical Restraint of Victim
          [U.S.S.G. § 3A1.3]   . . . . . . . . . . . .   33

       6.   Obstruction of Justice [U.S.S.G. § 3C1.1]   . .   38

       7.   Aggravating Role [U.S.S.G. § 3B1.1]   . . . . .   47

       8.   Mitigating Role [U.S.S.G. § 3B1.2]   . . . . . .   51

       9.   Multiple Count Adjustment
          [U.S.S.G. § 3D1.4] . . . . . . . . . . . . .   55

    F.   Defendants' Challenge to the Empirical
       Basis of the Guidelines Fails   . . . . . . . . .   57

## TABLE OF CONTENTS (CONTINUED)

**PAGE(S)**

III. DEFENDANTS' NON-GUIDELINES ARGUMENTS . . . . . . . . . .   58

    A.   Claims Raised By Multiple Defendants  . . . . . . .   58

        1.   "Sufficient, But Not Greater Than Necessary"   58

        2.   There is No Unwarranted Sentencing Disparity .   60

        3.   "Quince" Was Defendants' Friend  . . . . . . .   68

        4.   Anonymous Victim Impact Statements Are
            Properly Considered by the Court at
            Sentencing . . . . . . . . . . . . . . . . .   70

    B.   Miscellaneous Claims by Raised Each Defendant . . .   73

        1.   Defendant Gladys . . . . . . . . . . . . . .   73

        2.   Defendant Miriam . . . . . . . . . . . . . .   73

        3.   Defendant Angela . . . . . . . . . . . . . .   75

            a.   Factual Objections  . . . . . . . . .   75

            b.   The Nature and Circumstances of
               Defendant Angela's Offense Are
               Aggravating  . . . . . . . . . . . .   84

            c.   Defendant Angela's History and
               Characteristics Warrant No Leniency
               from the Court  . . . . . . . . . . .   87

            d.   Defendant Angela's Conduct Continued
               After the Mandatory Minimum Became
               Effective  . . . . . . . . . . . . .   88

            e.   Defendant Angela Does Have Criminal
               History  . . . . . . . . . . . . . .   89

            f.   A Sentence of Life Imprisonment Is
               Reasonable . . . . . . . . . . . . .   90

## <u>TABLE OF CONTENTS (CONTINUED)</u>

**PAGE(S)**

4.   <u>Defendant Maribel</u>   . . . . . . . . . . . . .   91

     a.   Maribel's Year Long Sex Trafficking
          Activities Were not Aberrant
          Behavior   . . . . . . . . . . . . . . .   92

     b.   Defendant Maribel's Family Circumstances
          are not Extraordinary   . . . . . . . . .   94

     c.   Defendant Maribel's Agreement to be
          Deported has no Meaning   . . . . . . . .   97

     d.   No Combination of Factors would
          Justify a More Lenient Sentence   . . . .   98

5.   <u>Defendant Gabriel</u>   . . . . . . . . . . . . .   99

     a.   Life Imprisonment Does Not Violate
          the Eighth Amendment for Defendants
          Sex Trafficking Convictions Involving
          Ten Victims   . . . . . . . . . . . . . .   99

     b.   Defendant Gabriel is Not Being Punished
          for Falling in Love   . . . . . . . . .   103

IV.   CONCLUSION   . . . . . . . . . . . . . . . . . . .   104

1

**TABLE OF AUTHORITIES**

2

**CASES:**                                                      **PAGE(S)**

3

Lockyer v. Andrade,
4        538 U.S. 63 (2003) ............................... 100, 101

5
Andrade v. California,
6        270 F.3d 743 (9th Cir. 2001),
         reversed on other grounds,
7        Lockyer v. Andrade, 538 U.S. 63 (2003) ........... 100, 101

8    Bordenkircher v. Hayes,
9        434 U.S. 357 (1978) .................................... 62

10   Harmelin v. Michigan,
         501 U.S. 957 (1991) ........................ 100, 101, 102
11
     McMillan v.   Pennsylvania,
12       477 U.S. 79 (1986) ...................................... 8

13   Santobello v. New York,
14       404 U.S. 257 (1971) .................................... 67

15   Sing v. Gonzalez,
         499 F.3d 969 (9th Cir. 2007) .......................... 14
16
     Solem v. Helm,
17       463 U.S. 277 (1983) ................................... 101

18   United States v. Aquilar-Muniz,
19       156 F.3d 974 (9th Cir. 1998) ......................... 100

20   United States v. Albino,
21       432 F.3d 937 (9th Cir. 2005) ......................... 100

22   United States v. Archdale,
         229 F.3d 861 (9th Cir. 2000) .......................... 23
23
24   United States v. Awad,
         371 F.3d 583 (9th Cir. 2004) ...................... 51, 55
25
     United States v. Banuelos-Rodriquez,
26       215 F.3d 969 (9th Cir. 2000) .......................... 63

27

28                              -iv-

**TABLE OF AUTHORITIES (CONTINUED)**

**CASES:**                                                    **PAGE(S)**

United States v. Barnes,
    993 F.2d 680 (9th Cir. 1993) .......................... 50

United States v. Becerril-Lopez,
    541 F.3d 881 (9th Cir. 2008) .......................... 61

United States v. Berlier,
    948 F.2d 1093 (9th Cir. 1991) ......................... 94

United States v. Calimlim,
    538 F.3d 706 (10th Cir. 2008) ......................... 30

United States v. Castaneda,
    239 F.3d 978 (9th Cir. 2001) ....................... 27-30

United States v. Changa,
    901 F.2d 741 (9th Cir. 1990) .......................... 63

United States v. Cruz-Ochoa,
    85 F.3d 325 (8th Cir. 1996) ........................... 97

United States v. Doe,
    488 F.3d 1154 (9th Cir. 2007) ......................... 70

United States v. Doubet,
    969 F.2d 341 (7th Cir. 1992) .......................... 37

United States v. Ebbers,
    458 F.3d 110 (2d Cir. 2006) ........................... 65

United States v. Egge,
    223 F.3d 1128 (9th Cir. 2000) ................... 6, 19, 48

United States v. Estrada-Plata,
    57 F.3d 757 (9th Cir. 1995) ....................... 66, 67

-v-

1

**TABLE OF AUTHORITIES (CONTINUED)**

2

**CASES:**                                                    **PAGE(S)**

3

4
United States v. Fairless,
     975 F.2d 664 (9th Cir. 1992) ........................ 92, 93

5

6
United States v. Fisher,
     132 F.3d 1327 (10th Cir. 1997) ........................ 36

7
United States v. Franklin,
     321 F.3d 1231 (9th Cir. 2003) ........................... 4

8

9
United States v. Galante,
     111 F.3d 1029 (2d Cir. 1997) ........................... 96

10

11
United States v. Gamez-Orduno,
     235 F.3d 453 (9th Cir. 2000) ........................... 67

12

13
United States v. Garcia,
     497 F.3d 964 (9th Cir. 2007) ........................... 49

14
United States v. Gaskill,
     991 F.2d 82 (3d Cir. 1993) ............................. 96

15

16
United States v. Gomez,
     472 F.3d 671 (9th Cir. 2006) ......................... 100

17
United States v. Gonzalez-Zotelo,
     556 F.3d 736 (9th Cir. 2009) ........................... 62

18

19
United States v. Goodwin,
     457 U.S. 368 (1982) ................................... 67

20

21
United States v. Haversat,
     22 F.3d 790 (8th Cir. 1994) ........................... 96

22

23
United States v. Hernandez-Franco,
     189 F.3d 1151 (9th Cir. 1999) ......................... 53

24

25
United States v. Herrera,
     640 F.2d 958 (9th Cir. 1981) .......................... 66

26
United States v. Horvath,
     522 F.3d 904 (9th Cir. 2008) .......................... 87

27

28

-vi-

**TABLE OF AUTHORITIES (CONTINUED)**

**CASES:**                                                      **PAGE(S)**

United States v. Inafuku,
    938 F.2d 972 (9th Cir.1991) ........................... 89

United States v. Johnson,
    132 F.3d 1279 (9th Cir. 1997) ........................ 28

United States v. Johnson,
    444 F.3d 1026 (9th Cir. 2006) .................. 8, 20, 38

United States v. Jordan,
    256 F.3d 922 (9th Cir. 2001) ................... 8, 9, 15

United States v. Klimavicius-Viloria,
    144 F.3d 1249 (9th Cir. 1998) ........................ 94

United States v. Kubick,
    205 F.2d 1117 (9th Cir. 1999) ........................ 89

United States v. Lam,
    20 F.3d 999 (9th Cir. 1994) .......................... 93

United States v. Leon,
    341 F.3d 928 (9th Cir. 2003) ......................... 94

United States v. Leon H.,
    365 F.3d 750 (9th Cir. 2004) ......................... 14

United States v. Lieberman,
    971 F.2d 989 (3d Cir. 1992) .......................... 36

United States v. Lindblad,
    254 Fed. Appx. 647, 2007 WL 4039782
    (9th Cir. Nov. 16, 2007) ............................. 65

United States v. Littlesun,
    444 F.3d 1196 (9th Cir. 2006) ......................... 7

United States v. Long,
    977 F.2d 1264 (8th Cir. 1992) ........................ 36

**TABLE OF AUTHORITIES (CONTINUED)**

**CASES:**                                                                    **PAGE(S)**

United States v. Long Turkey,
        342 F.3d 856 (8th Cir. 2003) ........................  35, 37

United States v. Luna,
        21 F.3d 874 (9th Cir. 1994) ............................   4

United States v. Madison,
        477 F.3d 1312 (11th Cir. 2007) .........................  10

United States v. Mendoza,
        262 F.3d 957 (9th Cir. 2001) ...........................  29

United States v. Mohamed,
        459 F.3d 979 (9th Cir. 2006) ...........................  91

United States v. Monaco,
        852 F.2d 1143 (9th Cir. 1988) ..........................  71

United States v. Mykytiuk,
        415 F.3d 606 (7th Cir 2005) ............................  61

United States v. Narramore,
        36 F.3d 845 (9th Cir. 1994) ...................  60, 63, 67

United States v. Osif,
        789 F.2d 1404 (9th Cir. 1981) ..........................  66

United States v. Parker,
        241 F.3d 1114 (9th Cir. 2001) ......................... 100

United States v. Pena,
        930 F.2d 1486 (10th Cir. 1991) .........................  96

United States v. Pena-Gutierrez,
        222 F.3d 1080 (9th Cir. 2000) ..........................  51

United States v. Petty,
        982 F.2d 1365 (9th Cir. 1993) ..........................  72

United States v. Pinkney,
        15 F.3d 825 (9th Cir. 1994) ............................  53

-viii-

**TABLE OF AUTHORITIES (CONTINUED)**

**CASES:**                                                    **PAGE(S)**

United States v Reese,
        2 F.3d 870 (9th Cir. 1993) ..................... 23, 36, 47

United States v. Reina-Rodriguez,
        468 F.3d 1147 (9th Cir. 2006)
        overruled in part on other grounds by,
        United States v. Grisel, 488 F.3d 844 (9th Cir. 2007) .. 68

United States v. Rose,
        20 F.3d 367 (9th Cir. 1994) ........................... 49

United States v. Sabatino,
        943 F.2d 94 (1st Cir. 1991) ........................... 28

United States v. Saeteurn,
        504 F.3d 1175 (9th Cir. 2007) ......................... 61

United States v. Santana,
        908 F.2d 506 (9th Cir. 1990) .......................... 70

United States v. Shabani,
        48 F.3d 401 (9th Cir. 1995) ........................... 62

United States v. Shryock,
        342 F.3d 948 (9th Cir. 2003) .......................... 76

United States v. Takai,
        941 F.2d 738 (9th Cir. 1991) ...................... 92, 93

United States v. Troiano,
        258 Fed. Appx. 983, 2007 WL 4385506
        (9th Cir. Dec. 12. 2007) .............................. 64

United States v. Vasquez-Landaver,
        527 F.3d 798 (9th Cir. 2008) .......................... 68

United States v. Veerapol,
        312 F.3d 1128 (9th Cir. 2002) ..................... 29, 30

United States v. Watts,
        519 U.S. 148 (1997) .................................... 8

-ix-

1

**TABLE OF AUTHORITIES**

2

**CASES:**                                                    **PAGE(S)**

3

United States v. Williams,
     291 F.3d 1180 (9th Cir. 2002),
     overruled on other grounds,
     United States v. Gonzales,
     506 F.3d 940 (9th Cir. 2007) (en banc) ................  28

United States v. Wright,
     891 F.2d 209 (9th Cir. 1989) ..........................  36

United States v. Zavala-Serra,
     853 F.2d 1512 (9th Cir. 1988) ........................  100

Weil v. Investment/Indicators, Research & Management, Inc.,
     647 F.2d 18 (9th Cir. 1981) ...........................  67

**STATUTES:**

8 U.S.C. § 1101(a)(43)(K) ...................................  97

8 U.S.C. § 1227(a)(2)(A)(iii) ...............................  97

8 U.S.C. § 1324 ........................................  7, 24

8 U.S.C. § 1328 .......................................  63, 64

18 U.S.C. § 371 ............................................  63

18 U.S.C. § 924(c) ..........................................  8

18 U.S.C. § 1591 ......................................  passim

18 U.S.C. § 2241 ......................................  passim

18 U.S.C. § 2242 .......................................  9, 10

18 U.S.C. § 2421 ...........................................  28

18 U.S.C. § 2423  .................................  20, 28, 63

18 U.S.C. § 3553(a)  .................................. passim

18 U.S.C. § 3661 ...........................................  6

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Following their convictions for sex trafficking and conspiracy, defendants Gladys Vasquez Valenzuela ("defendant Gladys"), Mirna Jeanneth Vasquez Valenzuela ("defendant Miriam"), Maria de los Angeles Vicente ("defendant Angela"), Maribel Rodriguez Vasquez ("defendant Maribel"), and Gabriel Mendez ("defendant Gabriel"), in their respective sentencing positions, challenge the application of various sections of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), raise certain factual objections to the Pre-Sentence Investigation Report ("PSR"), and make various legal arguments about the sentence they should receive.  For all the reasons set forth below, each of defendants' arguments fail, and each defendant should be sentenced to life imprisonment.

There are volumes of evidence in the record detailing defendants' egregious conduct recruiting and luring victims to the United States and then threatening and forcing them to work as prostitutes while defendants keep the money paid by their customers.  Because of the truly heinous nature of defendants' conduct and the inhumanity with which they treated their victims, this is a rare instance that warrants a sentence of life imprisonment, the maximum which the Court can impose.  A sentence of life imprisonment is the only sentence that is commensurate with defendants' repeated and prolonged forced prostitution of their victims, and the only sentence that adequately addresses each of the factors set forth in 18 U.S.C. § 3553(a).

## II.

### THE SENTENCING GUIDELINES CALCULATIONS

With the exception of defendant Gladys, defendants each raise various objections to certain Guidelines offense level adjustments recommended by the USPO.  For the reasons explained below, as well as the justifications previously set forth in the defendants' PSRs, each of the recommended Guidelines factors are fully applicable, and the defendants' objections, which are largely based on a fundamental misunderstanding of relevant conduct and the defendants' liability for jointly undertaken actions by their co-conspirators, as well as a misapprehension of the applicability and purpose of particular Guidelines enhancements and the supporting evidence in the record for each of them, should be rejected.

**A.   Summary of Defendants' Objections**

For ease of reference for the Court, the recommended Guidelines factors for each of the defendants are set forth below, identifying each factor to which that defendant objects.

**Defendant Gladys**
| | | |
|---|---|---|
| Base Offense Level: | 30 | |
| Forcible Sex Conduct: | +4 | |
| Victim age under 16 | +2 | |
| Victim in Care/Custody/Control: | +2 | |
| Leader/organizer: | +4 | |
| Vulnerable Victim: | +2 | |
| Restraint of Victim: | +2 | |
| Obstruction of Justice: | +2 | |
| Multiple Victim Adjustment: | +5 | |

**Defendant Miriam**
| | | |
|---|---|---|
| Base Offense Level: | 30 | |
| Forcible Sex Conduct: | +4 | |
| Victim age under 16 | +2 | OBJECTS |
| Victim in Care/Custody/Control: | +2 | OBJECTS |
| Vulnerable Victim: | +2 | OBJECTS |
| Restraint of Victim: | +2 | OBJECTS |
| Obstruction of Justice: | +2 | OBJECTS |
| Multiple Victim Adjustment: | +5 | |

2

**Defendant Angela**
```
Base Offense Level:                30
Forcible Sex Conduct:              +4    OBJECTS
Victim age under 16                +2    OBJECTS
Victim in Care/Custody/Control:    +2    OBJECTS
Leader/organizer:                  +4    OBJECTS
Vulnerable Victim:                 +2
Restraint of Victim:               +2    OBJECTS
Obstruction of Justice:            +2    OBJECTS
Multiple Victim Adjustment:        +5    OBJECTS IN PART
```

**Defendant Maribel**
```
Base Offense Level:                30
Forcible Sex Conduct:              +4    OBJECTS
Victim age under 16                +2    OBJECTS
Victim in Care/Custody/Control:    +2    OBJECTS
Vulnerable Victim:                 +2    OBJECTS
Obstruction of Justice:            +2    OBJECTS
Multiple Victim Adjustment:        +5
```

In addition, defendant Maribel objects to not receiving a 4-level downward adjustment for minimal role under U.S.S.G. § 3B1.2(a), or, in the alternative, a 2-level downward adjustment for minor role under U.S.S.G. § 3B1.2(b).

**Defendant Gabriel**
```
Base Offense Level:                30
Forcible Sex Conduct:              +4
Victim age under 16                +2    OBJECTS
Victim in Care/Custody/Control:    +2    OBJECTS
Vulnerable Victim:                 +2    OBJECTS
Restraint of Victim:               +2    OBJECTS
Obstruction of Justice:            +2    OBJECTS
Multiple Victim Adjustment:        +5    OBJECTS
```

In addition, defendant Gabriel objects to not receiving a 2-level downward adjustment for minor role under U.S.S.G. § 3B1.2(b).

**B.    Relevant Conduct: Co-Conspirators Are Responsible for All Jointly Undertaken Criminal Activity**

As is explained by the USPO in all of the PSRs for the defendants, each defendant is accountable for his or her own behavior, as well as the reasonably foreseeable actions of others

3

in furtherance of their jointly undertaken criminal activity. (See, e.g., Gladys PSR ¶ 61).  On this point, Sentencing Guidelines § 1B1.3 (Relevant Conduct: Factors That Determine the Guideline Range) is clear and explicit that the base offense level, specific offense characteristics, and Chapter Three adjustments (e.g., vulnerable victims) "shall be determined" on the basis of: (1) all acts committed or caused by the defendant; and (2) "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," which is defined as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3 (emphasis added).  Thus, for example, as relevant conduct, the defendants are responsible for acts of physical violence inflicted by other co-conspirators. E.g., United States v. Luna, 21 F.3d 874, 884 (9th Cir. 1994) (upholding 2-level adjustment for bodily injury sustained by a victim during a bank robbery where bank surveillance photos showed that a different robber hit the victim).  That is even the case if the particular defendant was not present during the offending conduct giving rise to the upward adjustment. United States v. Franklin, 321 F.3d 1231, 1236 (9th Cir. 2003) (finding appropriate a 7-level enhancement for discharge of a firearm during a robbery where defendant had assisted in planning the robbery months earlier but did not participate in the actual robbery).

Here, each defendant was charged and convicted by the jury of participating in a conspiracy to engage in sex trafficking by force, fraud, and coercion, as well as various substantive counts

4

of sex trafficking by force, fraud, and coercion.  Moreover, as

was adduced at trial and noted by the USPO, each defendant's

conduct regarding his/her victims of sex trafficking was

foreseeable to all other defendants in numerous ways, because

each of them participated (alone or jointly in various

combinations) in the following activities and/or was well aware

of such activities by the others: (1) recruiting and using others

to recruit the victims from Guatemala; (2) picking up the victims

from alien smugglers upon arrival in the United States;

(3) transporting the victims to the various defendants'

residences to live; (4) transporting the victims to areas to

solicit prostitution customers and to locations to engage in

prostitution; (5) renting apartments, motel rooms, or houses for

the purpose of prostitution; (6) helping to guard or control the

victims to prevent their escape; (7) selling or trading difficult

victims; and (8) searching for, threatening, and/or beating

victims who tried to escape.  (See, e.g., Gladys PSR ¶ 62).  In

fact, as discussed more specifically in reference to each of the

challenged Guidelines factors below, in most instances, each

defendant personally participated in conduct giving rise to the

enhancement, and, in all events, the conduct by other co-

defendants giving rise to the enhancement was entirely

foreseeable to all defendants.

**C.   Evidence That Can Be Considered At Sentencing and
       The Burden of Proof**

Many, if not most, of the defendants' objections to the

enhancements are purely legal in nature and, as discussed in turn

below, may be rejected as a matter of law (e.g., whether certain

5

enhancements are duplicative of the underlying conviction or
constitute impermissible double-counting in light of other
enhancements).  But for those objections that require factual
findings to address (e.g., age of the victims or obstruction of
justice), the defendants erroneously suggest limitations on what
the Court may consider in making such determinations of fact.
(See, e.g., Gabriel Brief at 9) (objecting to the use of victim
Karina/Alicia's birth certificate as evidence of age).

     To the contrary, Congress codified this Court's ability to
consider any information at sentencing: "No limitation shall be
placed on the information concerning the background, character,
and conduct of a person convicted of an offense which a court of
the United States may receive and consider for the purpose of
imposing an appropriate sentence."  18 U.S.C. § 3661 (emphasis
added).  Consistent with that congressional command, the
Sentencing Guidelines make explicit that "[i]n resolving any
dispute concerning a factor important to the sentencing
determination, the court may consider relevant information
without regard to its admissibility under the rules of evidence
applicable at trial, provided that the information has sufficient
indicia of reliability to support its probable accuracy.
U.S.S.G. § 6A1.3(a) (Resolution of Disputed Factors); see also
United States v. Egge, 223 F.3d 1128, 1132 (9th Cir. 2000) ("In
making factual determinations, a sentencing judge is generally
not restricted to evidence that would be admissible at trial).
The Ninth Circuit has embraced the principle that any information
may be considered and relied upon by the Court at sentencing and
has only imposed one modest limitation -- that the information or

testimony "be accompanied by some minimal indicia of
reliability." United States v. Littlesun, 444 F.3d 1196, 1198
(9th Cir. 2006) (emphasis added).

    Accordingly, here the Court may rely upon reports of
interview or documents which, for evidentiary or strategic
reasons, may not have been introduced or admitted into evidence
at trial.  Thus, for example, in addressing some of the
defendants' objections to the enhancement under U.S.S.G.
§ 2A3.1(b)(2) for the young age of the victims, the Court may
fully consider and rely upon the Guatemalan birth certificates of
the victims.  Or, in determining whether defendants Miriam and
Angela obstructed justice by threatening cooperating defendant
Flor Morales Sanchez, the Court may rely upon Morales's interview
reports and any corroborating evidence.  (Cf. Miriam Brief at 8)
(equating Morales's statements from interview reports disclosed
in discovery to "no evidence").

    Furthermore, contrary to law, the defendants suggest that
the Court cannot impose sentencing enhancements based on conduct
for which the jury did not reach a verdict.  (E.g., Gabriel Brief
at 9) (arguing that the Court's imposition of an enhancement for
the victims young age would amount to "reject[ing] the special
jury verdict"); (Angela Brief at 12-13) (arguing that Court
should not impose enhancement for victims being under care,
custody, and control of defendants because jury was unable to
reach a verdict on the 8 U.S.C. § 1324 alien harboring counts).
Rather, the Ninth Circuit has clearly held that the district
court may "appropriately consider[] factual allegations" in
support of sentencing enhancements, even where the jury did not

reach a verdict as to counts of conviction involving that same conduct.  United States v. Johnson, 444 F.3d 1026, 1029-30 (9th Cir. 2006) (noting that sentencing court may impose sentencing enhancements for use of weapons during the robbery, even though jury did not convict defendant for use of a firearm in violation 18 U.S.C. § 924(c)); see also United States v. Watts, 519 U.S. 148, 156 (1997) (concluding that the district court may consider at sentencing conduct for which a defendant was acquitted); United States v. Shryock, 342 F.3d 948, 989 (9th Cir. 2003).

Finally, defendant Miriam offhandedly -- and without citation to any legal support -- suggests that, with respect to the enhancement under U.S.S.G. § 2A3.1(b)(2) regarding the age of the victims, the Court must make such a finding "by clear and convincing evidence, if not evidence beyond a reasonable doubt." (Miriam Brief at 6).  The Supreme Court has held that the sentencing court need only find by a preponderance of the evidence sentencing factors under the Guidelines.  McMillan v. Pennsylvania, 477 U.S. 79, 92 (1986).  In cases in which the sentencing factor at issue will have an "extremely disproportionate effect" on the sentence, the Ninth Circuit has required proof of the factor by clear and convincing evidence. United States v. Jordan, 256 F.3d 922, 927 (9th Cir. 2001).[1]  As to what constitutes a disproportionate effect that would trigger the higher burden of proof, the Ninth Circuit has set forth six factors to consider: (1) whether the enhanced sentence falls

---

[1]    There is no support for defendant Miriam's suggestion that a sentencing enhancement must ever be proven beyond a reasonable doubt.

within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase is based on the extent of a conspiracy; (5) whether the offense level increase is less than or equal to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.  Id. at 928.  Applying the Jordan factors to each of the enhancements here, the court need not diverge from the general rule that it should evaluate sentencing enhancements under a preponderance standard.  Nonetheless, as demonstrated below, there is clear and convincing evidence to support all the disputed (and undisputed) sentencing enhancements.

**D.   Section 2A3.1 Applies to Each Defendant's Conduct**

Defendant Angela argues that the cross references in U.S.S.G. §§ 2G1.1(c)(1) and 2G1.3(c)(3) should not apply because the conduct described in 18 U.S.C. § 2241 is subsumed in the conduct proscribed by 18 U.S.C. § 1591.  (Angela Brief at 18).  Defendant is wrong.

U.S.S.G. §§ 2G1.1(c)(1) and 2G1.3(c)(3) each contain a cross reference that is to be applied if the offense conduct "involved conduct described in 18 U.S.C. § 2241(a) or (b) or 18 U.S.C. § 2242."  Section 2241(a) provides in relevant part that a person

may not

> knowingly causes another person to engage in a
> sexual act--(1) by using force against that other
> person; or (2) by threatening or placing that
> other person in fear that any person will be
> subjected to death, serious bodily injury, or
> kidnapping.

Section 2242 provides in relevant part that a person violates the

statute if he or she

> causes another person to engage in a sexual act by
> threatening or placing that other person in fear
> (other than by threatening or placing that other
> person in fear that any person will be subjected
> to death, seriously bodily injury, or kidnapping).

These statutes proscribe exactly what happened here, as borne out

by the testimony of the victims and the threats and force of

which they were the object.  Therefore, Section 2A3.1 applies to

defendants conduct.

The conduct that supports the cross-reference is not

subsumed in the conduct proscribed by 18 U.S.C. § 1591 (sex

trafficking by force, fraud, or coercion or of minors).  Sex

trafficking that does not include force -- for example, by fraud,

by coercion regarding abuse of law or the legal process (18

U.S.C. § 1591(e)(2)(C)), or of minors without force - would not

trigger the cross-reference.

Moreover, as defendant Gladys concedes (Gladys Brief at 5),

defendant Angela's position is precluded by the reasoning of

United States v. Madison, 477 F.3d 1312, 1316 (11th Cir. 2007).

In Madison, the Eleventh Circuit affirmed a district court's

application of § 2A3.1 where a defendant "used violence and fear

to cause [the victim] to engage in a sexual act with another

person, actions consistent with 18 U.S.C. § 2241 and § 2242.  Id.

10

The Eleventh Circuit also noted that "some overlap in the enhancement and cross-reference does not offend the Sentencing Guidelines or any other law," and that "the mandatory language contained in the cross-reference" was such that "when there is this overlap, the judge must apply the cross-reference".  Id.

**E.    Specific Offense Characteristics & Adjustments**

**1.    Use of Force [U.S.S.G. § 2A3.1(b)(1)]**

Defendants Maribel and Angela object to the application of the 4-level enhancement under U.S.S.G. § 2A3.1(b)(1) for use of force or threats.  This section states that the offense level should be increased by four levels "[i]f the offense involved conduct described in 18 U.S.C. § 2241(a) or (b)."  U.S.S.G. § 2A3.1(b)(1).  Conduct under 18 U.S.C. § 2241(a) includes causing (or attempting to cause) another person to engage in a sexual act "by using force against that other person" or "by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping."  18 U.S.C. § 2241(a).  The enhancement is proper here.

Defendant Maribel objects to this enhancement on the ground that "[o]ther than the assault on Esperanza, [defendant Maribel] did not directly threaten the victims with bodily harm and or death."  (Maribel Brief at 9).  The fact that defendant Maribel initiated and participated in the group beating of Esperanza (the occurrence of which she concedes) is alone sufficient to support application of the enhancement, because force was obviously used against victim Esperanza, who continued to work as a prostitute for the family thereafter.  Moreover, this violent episode also

11

supports the application of the enhancement on the separate and independent ground that it demonstrates that the use of force by her co-defendants was entirely foreseeable by defendant Maribel. Defendants Gladys and Miriam joined in the group beating, which included grabbing Esperanza by the hair, kicking and slapping her, and knocking her to the ground. (Tr. 1188-89). Moreover, as defendant Gladys beat Esperanza, in the presence of defendant Maribel, she threatened the two victims she had brought with her "[t]hat if they tried to do what [Esperanza] tried to do, that it was going to be even worse for them." (Tr. at 1190). For her part, in the presence of defendant Maribel, defendant Miriam further threatened Esperanza that "if [Esperanza] tried to run away, they were going to cut off [her] feet." (Tr. at 1190).

In addition, defendant Maribel's challenge to the 4-level enhancement for use of force and threats must be rejected because it relies on the fallacy that defendant Maribel did not threaten any other victims. (Maribel Brief at 9) (claiming that she "did not directly threaten the victims with bodily harm or death"). The record is replete with evidence that defendant Maribel threatened victim Tania so that she would continue to work as a prostitute, including: threatening to kill Tania (Tr. at 1728); threatening to have Tania's daughter in Guatemala harmed or killed (Tr. at 1728, 1736); threatening to have the "cholos" kill Tania (Tr. at 1728-29); threatening to cut up Tania's face (Tr. at 1736); and threatening to use harmful witchcraft against Tania (Tr. at 1736). Moreover, when victim Tania first attempted to escape and defendant Maribel and some of her co-defendants went to collect Tania from her hideout, defendant Maribel was present

when defendant Gladys threatened to have the "cholos" come and shoot Tania down if she did not come back with the family.  (Tr. at 1750).  For all of these reasons, the four-level enhancement for use of force or threats applies to defendant Maribel.

By contrast, implicitly conceding that the sex trafficking conspiracy involved the use of force and threats against the victims, defendant Angela's challenge to the application of the U.S.S.G. § 2A3.1(b)(1) enhancement is purely legal.  But her legal challenge is no less flawed than defendant Maribel's factual one.  Defendant Angela's objection relies upon language from application note 2 to U.S.S.G. § 2A3.1, which states that "[i]f the conduct that forms the basis for the conviction under 18 U.S.C. § 2241(c) is that the defendant engaged in conduct described in 18 U.S.C. § 2241(a) or (b), do not apply (b)(1)." (Angela Brief at 12).[2]  From this language defendant Angela concludes that the (b)(1) enhancement should not be applied to her conviction under 18 U.S.C. § 1591(b)(1) (Sex Trafficking by Force, Fraud or Coercion).  (Angela Brief at 12).  Defendant Angela, however, misses the critical point that the instruction in application note 2 to refrain from applying the (b)(1) enhancement, by its explicit terms, only applies to convictions for violating 18 U.S.C. § 2241(c) (Sexual Act or Abuse Involving

---

[2]     While not explicitly raising it as an objection to the § 2A3.1(b)(1) enhancement for force, as part of her general argument that the Guidelines lead to an unreasonable sentence, defendant Angela suggests that the force enhancement in inappropriate because it would be applied "[i]n almost any 18 U.S.C. § 1591 case."  (Angela Brief at 20).  The argument that the 4-level enhancement is impermissible or inappropriate, however, has been squarely rejected.  United States v. Chee, 514 F.3d 1106, 1116 (10th Cir. 2008); United States v. Amos, 952 F.2d 992, 994 (8th Cir. 1991).

Minors Under 12 or 16), which is not at issue in this case.
Indeed, the very title of the clause upon which defendant Angela
relies is "Application in Cases Involving a Conviction under 18
U.S.C. § 2241(c)."  See Sing v. Gonzalez, 499 F.3d 969, 977 (9th
Cir. 2007) (noting that the title of the statutory provision "may
be instructive in putting the statute in context").

     Furthermore, by reading application note 2 in the overbroad
manner advanced by defendant Angela, U.S.S.G. § 2A3.1(b)(1) is
rendered entirely superfluous.  Under defendant Angela's
interpretation, the instruction in U.S.S.G. § 2A3.1(b)(1) that
"[i]f the offense involved conduct described in 18 U.S.C.
§ 2241(a) or (b), increase by 4 levels" can never be followed,
because, if one ignores the express limitation in application
note 2 to convictions under 18 U.S.C. § 2241(c), the remainder of
application note 2 would broadly command that if "the defendant
engaged in conduct described in 18 U.S.C. § 2241(a) or (b), do
not apply subsection (b)(1)."  As such, defendant Angela's
reliance on the inapplicable provisions of application note 2
must be rejected, and her objection to the four-level enhancement
for use of force and threats overruled.  United States v. Leon
H., 365 F.3d 750, 753 (9th Cir. 2004) ("We avoid statutory
interpretations that render entire sections of the statute
superfluous.").

     **2.   Age of Victims [U.S.S.G. § 2A3.1(b)(2)]**

     Defendants Miriam, Angela, and Gabriel object to the
application of a two-level increase in offense level based on the
fact that victims Karina/Alicia and Alejandra were less than 16
years old at the time of the offense, claiming that there is

14

insufficient proof of age to support the enhancement and that its application is precluded by the jury's findings on the special verdict form.[3]  (Miriam Brief at 5-6; Angela Brief at 12; Gabriel Brief at 8-9).  There is clear and convincing evidence before the court, however, of Karina/Alicia and Alejandra's age:  each victim's birth certificate, her testimony, the testimony of other witnesses, photographs, and her appearance and demeanor, as described in more detail below, demonstrate that she were less than 16 years old during the offense.[4]  Moreover, the jury's inability to unanimously agree that the government proved beyond a reasonable doubt that any victims were under 18 years of age does not preclude the court from making factual findings based on a wider body of evidence and under a lower standard of proof at

---

[3]  Defendant Maribel also objects to the application of the enhancement in the calculation of her sentencing guidelines range, but does not contest the evidence of these victims' ages. Rather, Maribel contends that she was not "actively involved" in the recruitment and forced prostitution of these victims, and thus the enhancement should not be applied to her.  (Maribel Brief at 9) (emphasis added).  As set forth above, however, the co-conspirator's conduct with respect to Karina/Alicia and Alejandra constitutes relevant conduct for Maribel's offense of conviction.  (See Section II.B)  Therefore, application of the enhancement to her guidelines calculation is proper.

[4]  Under the Jordan (256 F.3d at 927) factors, the court properly may find that age has been established by a preponderance of the evidence alone.  The first four factors do not apply.  The fifth factor, whether the offense level increase is less than or equal to four, weighs in favor of the preponderance standard here because only a two level enhancement is at issue.  Likewise, the sixth factor, whether the lenght of the enhanced sentence more than doubles the length of the original authorized range, is not satisfied.  Although defendant Miriam points out that "at level 34, the addition of two levels adds 37 months" (Miriam Brief at 6), that 37 months is a far cry from doubling the 151-188 month range for an offense level 34. Thus, there is no reason to believe that the Court must diverge from the general rule that it should apply a sentencing enhancement based on a preponderance of the evidence.

1  sentencing.

2      Karina/Alicia's birth certificate demonstrates the specific

3  date of her birth in 1993.   (Under Seal Ex. D).  Karina/Alicia

4  testified that she was born on that date.  (Tr. at 686).

5  Karina/Alicia's mother, Bacilia Veliz-Mijangos, also testified

6  that she gave birth to Karina/Alicia on that same date.  (Tr. at

7  852).  Karina/Alicia appeared young during her testimony and

8  photographs from the time period of the conspiracy that were

9  admitted at trial.  Moreover, testimony at trial demonstrated

10 that during the time Karina/Alicia lived with defendants Miriam

11 and Gabriel and was forced to work as a prostitute, she acted

12 like a minor – she kept stuffed animals in her room and dressed

13 up for Halloween with defendant Miriam and Gabriel's other

14 children.  (See Def. Trial Exs. 209, 210, 211).  And defendant

15 Miriam was clearly aware of the fact that Karina/Alicia was a

16 minor, because defendant Miriam instructed her to tell the police

17 that she was 20 years old.  (Tr. at 725-26, 773-74).

18 Karina/Alicia followed these instructions when she was contacted

19 by law enforcement agents on December 20, 2006.  (See Tr. at

20 805).  Defendant Miriam even attempted to procure a Guatemalan

21 identification card (described as a "cedula" at trial) for

22 Karina/Alicia, but Ms. Veliz-Mijangos explained that she could

23 not obtain a "cedula" for Karina/Alicia because she was under 18.

24 Undeterred, defendant Miriam asked Ms. Veliz-Mijangos for the

25 "cedula" belonging to Karina/Alicia's older sister.  (Tr. at 861-

26 62).  Clear and convincing evidence therefore demonstrates that

27 Karina/Alicia did not turn 16 after trial, on April 25, 2009.  No

28 contradictory evidence has been presented.

Alejandra's birth certificate demonstrates that she was born
on a particular date in 1992. (Under Seal Ex. B). Alejandra and
her mother, Elida Marisol Cano-Solis, each testified that
Alejandra was born on that date. (Tr. at 982, 1134). Alejandra
appeared young and naive at trial (more than two years after she
had been victimized by defendants) and in photographs from the
time period of the conspiracy that were admitted at trial. (See
Def. Trial Exs. 214-17). Defendant Morales testified that, at
defendant Angela's direction and in response to defendant
Angela's instruction that she find younger girls, Morales
recruited Alejandra to come to the United States by falsely
promising her a job as a babysitter. Morales knew at the time
that Alejandra was only 13 years old. Morales initially told
defendant Angela that Alejandra was under 18, but after Alejandra
arrived in the United States, Morales told defendant Angela that
Alejandra was only 13. (Tr. at 1430-33, 1437-38). Alejandra
told defendant Angela that she was only 13 as well, and defendant
Angela even threw a 14th birthday party for Alejandra. (Tr. at
1118-1122; Def. Trial Exs. 214-17). Alejandra acted like a 14
year-old at her birthday party, by smashing her face in the cake.
Defendant Angela instructed Alejandra to lie about her age and to
say that she was 21 years old. Co-defendant Armando instructed
Alejandra to lie about her age to the police. (Tr. at 1008-09;
Tr. at 1118, 1120-22). Accordingly, clear and convincing
evidence demonstrates that Alejandra did not turn 16 years old
until 2008, well after the conspiracy had ended. There was no
contradictory evidence regarding Alejandra's age.

Defendant Miriam's contention that, absent a demonstration

1   of "the culture. . . their method of keeping track of dates . . .

2   [and] their awareness of the calendar," Basilia Veliz-Mijangos

3   and Elida Marisol Cano-Solis could not provide reliable testimony

4   about the dates they gave birth to Karina/Alicia and Alejandra,

5   respectively, is absurd.  These witnesses testified credibly at

6   trial, and on cross-examination no defendant successfully

7   challenged their method or ability to keep track of dates or

8   their understanding of a calendar.  Although these witnesses were

9   poor and uneducated, there was no demonstration that they were

10  incapable of knowing what a "date of birth" is.

11       Defendant Miriam's claim that these victims and their

12  mothers had an incentive to lie about age to receive government

13  benefits is also baseless.  First, there was no evidence that the

14  parents received any immigration benefits from the government.

15  Moreover, although the Karina/Alicia and Alejandra themselves

16  were cross-examined about immigration benefits they received,

17  there was no claim, much less evidence, that the benefits were

18  conditioned on any specific testimony regarding age.

19       The victims' and mothers' testimony is now also corroborated

20  by the victims' birth certificates, which were not introduced at

21  trial.  (See, Under Seal Exs. B, D).  Each of the birth

22  certificates was certified by the Civil Registrar for the

23  Guatemalan city in which it was issued, and bears the official

24  seal of the Civil Registrar.  Defendant Gabriel's misleading

25  quotation from a government pleading notwithstanding,[5] the

26  _____

27       [5]   On July 25, 2008, defendants filed a motion in limine
     to preclude the government from introducing the victims' birth
28   certificates at trial.  (CR 392).  The government did not oppose
     the motion.  Defendants then notified the government that they

18

government did not previously concede that the birth certificates are unreliable.  Rather, the government simply did not seek to introduce the birth certificates at trial, where the strict requirements of Federal Rule of Evidence 902(3) would apply.  But under the more relaxed standards governing evidence at sentencing, the birth certificates are entirely appropriate, particularly when viewed in combination with the victims' and mothers' testimony, the victims' appearances and demeanor, and evidence of the victims' appearance and behavior during the offense.  Egge, 223 F.3d at 1132.

Finally, defendants' claim that the jury's findings preclude application of the two level enhancement for victim age, or that a finding by the court would render the jury's role "superfluous," is meritless.  Defendants' position fails to appreciate both the nature of the jury's findings and the distinction between the jury's role at trial and the court's role at sentencing.  First, the jury did not conclude that Karina/Alicia and Alejandra were over the age of 16, nor that they were adults.  The jury could not unanimously agree that the evidence established beyond a reasonable doubt that the minor victims were in fact under the age of 18 with respect to the sex trafficking charges on which they found defendants guilty, and

---

intended to introduce foreign documents themselves.
Specifically, defendants proposed documents that they claimed demonstrated certain victims had registered as prostitutes in Guatemala.  The government filed a motion in limine to preclude admission of these documents because they neither established the facts alleged, nor met the requirements of FRE 902(3).  (CR 395)  The government argued that, under defendants' own logic regarding the birth certificates, the so-called prostitution records were insufficiently reliable.

were unable to reach a verdict the interstate transportation of a
minor (18 U.S.C. § 2423) charges.  The jury's inability to reach
a unanimous decision, however, does not preclude the court from
determining these facts at sentencing, particularly where
additional evidence is presented and a lower standard of proof
applies.  <u>Johnson</u>, 444 F.3d at 1029-30.  (<u>See</u> Section II.C).  The
evidence presented demonstrates, clearly and convincingly, that
both Karina/Alicia and Alejandra were, in fact, under the age of
16 during the commission of the offense.[6]

### 3.   Care/Custody/Control [U.S.S.G. § 2A3.1(b)(3)]

Defendants Miriam, Gabriel, Angela, and Maribel each object
to the enhancement under U.S.S.G. § 2A3.1(b)(3)(victims under
care/custody/control of defendants) on various overlapping
grounds.  Section 2A3.1(b)(3) provides for a two-level increase
in the offense level if the victim was "in the custody, care, or
supervisory control of the defendant."  U.S.S.G.
§ 2A3.1(b)(3)(A).  Application note 3 to § 2A3.1 instructs that
this subsection "is to be construed broadly" and identifies the
situation in which a victim less than 18 is entrusted to the
defendants as appropriately covered by this subsection.
Furthermore, the application note provides a non-exhaustive list
of examples, including teachers, day care provides, baby-sitters,
and temporary caretakers.  U.S.S.G. § 2A3.1 app. note 3.

In applying this enhancement to all of the defendants, the

---

[6]     The evidence also demonstrates that victims
Sandra/Vanessa, Rosaura, and Esperanza were under the age of 18
during the period that defendants forced them to work as
prostitutes.  (<u>See</u> Under Seal Exs. A, C, E; Tr. at 432, 1142,
1146, 1151, 1157-58, 2120).

USPO notes that "[i]n determining whether to apply this
enhancement, the court should look to the actual relationship
that existed between the defendants and the minor and not simply
to the legal status of the defendant-minor relationship. (<u>E.g.</u>,
Gabriel PSR ¶ 83). Thus, with respect to victims Alejandra and
Karina/Alicia, the USPO found the enhancement applicable because
they "were each 13 years old when they were smuggled into the
United States" and because "[a]s minors, they were unable to care
for themselves, and [were] forced to rely upon the defendants for
basic needs such as food, shelter, and clothing." (<u>E.g.</u>, Gabriel
PSR ¶ 83). Toward this end, the USPO notes that victim
Karina/Alicia came to the United States after a co-conspirator
named Tio told Karina/Alicia's parents that she would be well
taken care of the United States and that she should not even
bring any clothes because such things would be provided to her
once she arrived. (<u>E.g.</u>, Gabriel PSR ¶ 51).

Defendant Miriam objects to this enhancement on the ground
that there is a "lack of reliable evidence of age of the
victims." (Miriam Brief at 6). Defendant Angela also objects
factually to this enhancement on the ground that the jury did not
unanimously find that the victims were under the age of 18.
(Angela's Brief at 12). To begin with, these objections are
premised on the assumption that § 2A3.1(b)(3) only applies to the
care, custody, or supervisory control of minors. But the
explicit words of § 2A3.1(b)(3) refer only to "victim," and
§ 2A3.1 itself applies to convictions for sex trafficking by
force involving minors or non-minors. Morever, application note
3 simply lists as an instance in which the § 2A3.1(b)(3)

21

enhancement may apply "offenses involving a victim less than 18 years of age entrusted to the defendant," and the application note does not limit the enhancement only to situations involving minors; rather, it counsels that the provision should be "construed broadly."  Thus, for example, there is nothing in the plain language of § 2A3.1(b)(3) or its commentary to suggest that the enhancement could not be applied where a mentally handicapped adult in the care of the defendant is forced to engage in prostitution, or, where, as in the instant case, young women over the age of 18 were sent by their families in an impoverished foreign country to live with the defendants in the United States.[7]  But the Court need not even reach this issue, as it is clear from the discussion in Section II.E, that there is ample evidence that victims Alejandra, Karina/Alicia and others were minors while entrusted to the care of the defendants.

Defendant Miriam also argues that the § 2A3.1(b)(3) enhancement is duplicative of the four-level enhancement for use of force and threats under U.S.S.G. § 2A3.1(b)(1), noting that § 2A3.1(b)(1) punishes defendants for "controlling" victims through force and threats.  (Miriam Brief at 6).  But the "control" exerted over the victims through force and threats is different from the type of "care, custody, and supervisory

---

[7]     For example, victim Ingrid's mother testified that, after she had sent Ingrid to be cared for by the Vasquez Valenzuela family, defendant Gladys called and told her (falsely) that "I've been taking good care of her." (Tr. at 1394-95).  As another example, victim Tania, who had come to the United States only after co-conspirator Chepe spoke to her parents (Tr. at 1708-09), compared defendant Gladys to a mother figure and explained that she was particularly upset after defendant Gladys tried to hit her "because I wanted her to take care of me but not hit me."  (Tr. at 1774).

control" at issue in § 2A3.1(b)(3).  Here, because, for example,
Karina/Alicia's parents had entrusted her to the defendants' care
in a foreign country, and because Karina/Alicia depended on
defendants for food and shelter, that situation contributed to
the defendants' ability to force Karina/Alicia to work as a
prostitute and hindered her likelihood of escaping.  The beatings
and threats also caused Karina/Alicia to work as a prostitute and
refrain from running away, but in a manner separate and apart
from the way in which the defendants' care and custody over
Karina/Alicia permitted and furthered her ready victimization.
Cf. United States v Reese, 2 F.3d 870, 895 (9th Cir. 1993)
(explaining that impermissible double-counting occurs only if the
Guidelines provision increases punishment based on a kind of harm
that has already been fully accounted for by application of
another Guidelines provision); see also United States v.
Archdale, 229 F.3d 861, 871 n.7 (9th Cir. 2000) (noting, without
issue, that "the district judge added four levels for the use of
force (U.S.S.G. § 2A3.1(b)(1)) [and] two levels because the
victim was in the care, custody and control of appellant
(U.S.S.G. § 2A3.1(b)(3)(A)").  For these same reasons, the Court
should also reject defendant Angela's very similar argument that
§ 2A3.1(b)(3) is "subsumed within" her conviction for 18 U.S.C.
§ 1591 (Sex Trafficking by Force, Fraud, or Coercion) under her
theory that the force and threats necessary to make the victims
work as prostitutes is somehow the same as exercising care,
custody, or supervisory control over the victims.  (Angela Brief
at 13).

        Defendant Gabriel argues that he is "simply not the type of

defendant to which this enhancement applies" because, in his view, the enhancement is supposed to apply to teachers, day care providers, baby sitters, or other temporary caretakers. (Gabriel Brief at 10). While application note 3 explains that the § 2A3.1(b)(3) enhancement may apply to teachers and the like, the note also clearly states that "the court should look to the actual relationship" and "not simply to the legal status" between the defendant and victim. U.S.S.G. § 2A3.1 app. note 3. As noted above, there is no dispute that victim Karina/Alicia (as well as victim Sandra/Vanessa) were young minors living under the care of defendants Gabriel and Miriam when they were forced to work as prostitutes, and accordingly the two-level enhancement under U.S.S.G. § 2A3.1(b)(3) applies to both of them.

Defendant Angela objects to the care/custody/control enhancement on the ground that the jury was not able to reach a verdict on the 8 U.S.C. § 1324 count for harboring an alien. (Angela Brief at 13). As discussed in Section II.C, just because the jury did not convict the defendants of harboring aliens in violation of 8 U.S.C. § 1324 does not mean that the victims did not live with the various defendants under their care, custody and supervisory control. Indeed, the jury might not have returned guilty verdicts on the § 1324 charges because they could not agree unanimously that having the victims living under the care of the defendants satisfied the element of shielding the alien victims from detection by immigration authorities, which is what the jury's note suggested (2/6/09 Trial Transcript). Indeed, it is essentially undisputed that, as a factual matter, the victims lived under the care of the defendants.

24

1    Defendant Angela additionally argues that § 2A3.1(b)(3)
2  should not apply because the enhancement was not included in the
3  negotiated plea agreements offered by the government in advance
4  of trial.  (Angela Brief at 12-13).  For the reasons discussed in
5  Section III.A.2, what the government offered as part of a pre-
6  trial disposition (which defendant Angela did not accept) is
7  entirely irrelevant to whether the Court, based on the record
8  before it after an extensive trial involving weeks of testimony
9  from numerous witnesses and victims, should apply the
10  enhancement.

11    Finally, defendant Maribel objects to application of the
12  enhancement as to her because she "had no active role in the
13  recruitment and or enforcement of servitude of Alejandra and
14  Karina/Alicia."  (Maribel Brief at 9).  While that may be true,
15  as discussed above in Section II.B., defendant Maribel is
16  accountable for the reasonably foreseeable conduct of her co-
17  defendants in furtherance of their sex trafficking conspiracy.
18  It is undisputed that each of the defendants had various victims
19  living under their care and control, and defendant Maribel was
20  well aware that her aunts and defendant Gabriel had such victims
21  living under their care, including victims who were minors.  For
22  example, when minor victim Sandra/Vanessa first arrived in the
23  United States, defendant Maribel was with defendants Miriam and
24  Gabriel to pick her up from the alien smugglers and brought her
25  back to live at defendants Gabriel's and Miriam's house along
26  with minor victim Karina/Alicia.  (Maribel PSR ¶ 52; Tr. at 431-
27  33).  Defendant Maribel also knew that victims Karina/Alicia and
28  Sandra/Vanessa were under the care and control of defendants

25

Miriam and Gabriel because she sometimes accompanied defendants Miriam and Gabriel when they took their two young victims out to eat. (Tr. at 602-03).

For all of the foregoing reasons, the defendants' various objections -- both legal and factual -- should be rejected, and the two-level enhancement under U.S.S.G. § 2A3.1(b)(3) for the victims being under the care, custody and control of the defendants should apply to all of them.

**4.   Vulnerable Victim [U.S.S.G. § 3A1.1]**

Defendants Miriam, Maribel, and Gabriel object to the application of a two-level enhancement for the involvement of vulnerable victims pursuant to U.S.S.G. § 3A1.1. (Miriam Brief at 6-7; Maribel Brief at 9; Gabriel Brief at 10). Section 3A1.1 provides that "if the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by two levels." The application notes to this section advise that a "vulnerable victim" is a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct," but that the enhancement should not be applied "if the factor that makes the person a vulnerable victim is incorporated in the offense guideline." Application Notes 2 and 3. Here, the victims qualify as vulnerable victims, as the Court has already found with respect to victim Alejandra.

Taking just one as an example, Alejandra -- like each of the other victims -- was vulnerable because she was an uneducated, unsophisticated, impoverished, non-English speaking illegal alien who was transported over 3,000 miles to a country in which she

had no contacts other than defendant and her co-conspirators.[8]

Alejandra was also unusually vulnerable because she believed in

witchcraft, a belief defendant's co-conspirators exploited to

keep Alejandra in line.  As set forth below, The Ninth Circuit

has recognized that a victim's status as an illegal alien, a

victim's separation from family in a foreign country, and a

victim's status as a poor, uneducated, and unsophisticated

immigrant can support the application of the vulnerable victim

enhancement.

United States v. Castaneda, 239 F.3d 978, 983 (9th Cir.

2001), does not preclude application of the vulnerable victim

enhancement in this case, as argued by defendant Miriam.  (Miriam

Brief at 7).  In Castaneda, the Ninth Circuit (over a vigorous

dissent) reversed the application of the vulnerable victim

enhancement based on economic vulnerability of victims where the

defendant had been convicted of interstate transportation of

adults for purposes of prostitution under the Mann Act, holding

that all victims of the general offense involved were typically

economically vulnerable.  239 F.3d at 983.  The Castaneda holding

---

[8]     The government is not relying on Alejandra's age -- 13 -- nor the age of the other victims as a basis for the vulnerable victim enhancement because their ages have been taken into account by the application of U.S.S.G. 2G1.3 (Promoting a Commercial Sex Act or Prohibited Sexual Conduct with a Minor). Application Note 3 to U.S.S.G. 3A1.1 specifically provides that "if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age." The factors set forth above that demonstrate Alejandra's vulnerability, as well as the vulnerability of the other victims, are unrelated to age.  Therefore defendant Gabriel's argument that vulnerability is subsumed within age should be rejected, as it already has been by the Court.  (Gabriel Brief at 10; Apr. 27, 2009 Tr. at 18).

27

should be limited to non-forced prostitution of adults under the specific statute involved therein, 18 U.S.C. § 2421.  Castaneda itself recognized that different provisions of the Mann Act, including transportation of minors for purposes of prostitution under § 2423 (at issue here) may properly give rise to a vulnerable victim enhancement based on an individualized assessment of the victim, as in United States v. Johnson, 132 F.3d 1279 (9th Cir. 1997).[9]

In Johnson, the court upheld the application of the vulnerable victim enhancement where the defendant had been convicted of transporting a minor boy from Norway to the United States with intent to engage in sexual activity.  The specific factors that made the boy especially vulnerable were:  his isolation, cultural ignorance, and the fact that his molester was his host parent in a school exchange program.  These facts would not be present in every victim of a § 2423 offense.  Similarly, in the instant case, not every minor victim of § 2423 would be an illegal alien, unable to speak English, uneducated, and unsophisticated.  Indeed, because § 2423 covers interstate transportation of a minor as well as international transportation, not every victim would be as physically removed

---

[9]  Defendant Miriam also cites United States v. Williams, 291 F.3d 1180, 1195-96 (9th Cir. 2002), overruled on other grounds, United States v. Gonzales, 506 F.3d 940 (9th Cir. 2007) (en banc), but fails to mention that Williams upheld the application of the vulnerable victim enhancement in a Mann Act case because of a victim's mental condition, including her chemical dependency and past abuse, and remanded for further proceedings to determine if it applied to another victim, despite the holding of Castaneda.  Defendant Miriam also cites United States v. Sabatino, 943 F.2d 94, 102-04 (1st Cir. 1991), which is relied upon by Castaneda and distinguishable for the same reasons Castaneda is.

from his or her homeland as Minor Female #4 (Alejandra) was.

In United States v. Mendoza, 262 F.3d 957 (9th Cir. 2001), the vulnerability enhancement was based on the fact that the victims were illegal aliens.  Defendant Mendoza was convicted of conspiracy, sale of false immigration documents, and impersonating a United States official.  The district court applied the vulnerable victim enhancement on the ground that the illegal alien victims were especially vulnerable because they "are here under a cloud and therefore . . . they are afraid," and noted that one victim "seemed particularly vulnerable, not very sophisticated at all, very frightened by what was going to happen to her and her family if she had to leave." Mendoza, 262 F.3d at 959.  The Ninth Circuit affirmed the application of the enhancement, distinguishing the case from Castaneda by noting that the characteristics that made Mendoza's victims vulnerable were not shared by all victims of illegal sales of immigration documents.  Id. at 961.

Similarly, in United States v. Veerapol, 312 F.3d 1128, 1132-34 (9th Cir. 2002), the Ninth Circuit upheld the application of the victim vulnerability enhancement based on the fact that the victim of involuntary servitude was a poor, uneducated, unsophisticated immigrant.  The Veerapol court recognized that Castaneda prohibits application of the enhancement "in rare circumstances where . . . the victim's vulnerability is typically incorporated into the offense." 312 F.3d at 1133.  That limitation, however, does not apply where the specific manner in which the defendant committed the offense is a scheme that typically targets people like the instant victims.  Accordingly,

Veerapol was subject to the enhancement because he targeted poor, unsophisticated, non-English-speaking illegal aliens to coerce into involuntary servitude.   Id.

The Tenth Circuit aptly described the limitation of Castaneda in United States v. Calimlim, 538 F.3d 706 (10th Cir. 2008), when it upheld the application of the vulnerable victim enhancement in a forced labor and alien harboring case.   The Calimlim court noted that Castaneda differentiates between victims of the particular scheme and victims of the general offense, permitting application of the enhancement when the victim is vulnerable in a way targeted by defendant's particular scheme, but not when the vulnerability is shared by all victims of a general offense.   The victim in Calimlim was very similar to Alejandra here, except that the she was forced to work as a domestic servant rather than a prostitute.   The Calimlim victim was young (19 years old), illegally present in the United States, from an impoverished family in a distant country (the Philippines) that was dependent on money she earned, did not speak English, not allowed to leave the defendants' home without permission, not permitted to speak on the telephone to her family members in private, and repeatedly told by defendants that if she was discovered in the United States she would be arrested, imprisoned, and deported.   538 F.3d at 708-09.   The Tenth Circuit found that these characteristics were specific to the defendants' particular scheme, and not present for every victim of the general offense of forced labor, noting that "with enough muscle, it would be possible to coerce a perfectly able-bodied, English-speaking, independent American citizen into forced labor."   538

F.3d at 717.

In the instant case, the defendants' victims, particularly Alejandra, were unusually vulnerable, and thus the enhancement should be applied. Alejandra testified with the assistance of a Spanish language interpreter because she does not speak English. She testified that she only went to school up to third grade because her grandmother didn't have enough money to pay for her to continue in school. (Tr. at 985). After she dropped out of school, Alejandra worked as a child to support herself and her grandmother. (Tr. at 985). Co-defendant Morales and Alejandra both testified that Morales lured Alejandra to travel to the United States with promises of legitimate work (not as a prostitute), and that she traveled to the United States illegally with the assistance of coyotes arranged and paid for by defendants. Alejandra explained that she planned to use the money she earned to help her grandmother. (Tr. at 987). Alejandra testified that she believed in witchcraft and was frightened by defendants' threats about witchcraft. (Tr. at 1003-04). Thousands of miles away from her family and home country, Alejandra was allowed to telephone home, but was not allowed to speak privately with her family. (Tr. at 1021-25). Alejandra's demeanor during her testimony further demonstrated that she was unsophisticated.

Defendant Gabriel argues that the USPO should somehow be "precluded" from seeking a vulnerable victim adjustment because it did not do so for co-defendant Bonifacio. (Gabriel Brief at 10). But as set forth in Section III.A.2, the USPO's recommendations regarding one defendant have no preclusive effect

31

on the PSRs for the other defendants, nor do they bind the court
in any way.   Thus, whether the USPO is precluded from
recommending this enhancement (which it is not), the Court is not
precluded from applying it (and in fact should apply it).

Defendant Bonifacio negotiated his plea agreement, pleaded
guilty, and was sentenced well before the evidence establishing
the victims' vulnerability -- and how it was exploited -- was
developed through live testimony.   In contrast, following trial
the USPO did recommend the vulnerable victim enhancement be
applied to co-defendant Armando.   (Armando PSR Addendum at 1).
Indeed, the Court also ruled that the enhancement applied to co-
defendant Morales.   (Apr. 27, 2009 Tr. at 21-22).   Co-defendant
Armando has not yet been sentenced.   While it was reasonable for
defendant Bonifacio to receive leniency for pleading early, it is
not reasonable for defendant Gabriel to receive a windfall based
on defendant Bonifacio's wisdom, particularly where other co-
defendants did not.

Defendant Maribel objects to the vulnerable victim
enhancement on the basis that she "was not actively involved" in
the recruitment and/or transportation of the victims and "was not
involved in the active ongoing threats to many of the victims."
(Maribel Brief at 9).   This, again, misstates the law of relevant
conduct for sentencing purposes, and Maribel is accountable for
her co-defendants' conduct in furtherance of the conspiracy in
which she operated.   (See Section II.B).   Aside from that, like
Alejandra and other victims, Tania was uneducated,
unsophisticated, impoverished, and did not speak English in a
country to which she had been lured 3,000 miles away from home.

32

Furthermore, the PSR indicates that Maribel "told Tania that she would kill her, or cut her face, or send gang members after Tania, or have Tania's daughter killed."  (Maribel PSR ¶ 43). This shows that Maribel actually exploited the vulnerable nature of her victims, and would reasonably foresee that the other defendants engaged in the same conduct in order to control their victims.

Alejandra's testimony, combined with the Court's observations of Alejandra's demeanor during her testimony establish that she was unusually vulnerable because she was an uneducated, unsophisticated, impoverished, non-English speaking illegal alien who was transported over 3,000 miles to a country in which she had no contacts other than defendant and her co-conspirators.  The other nine victims of the conspiracy shared these characteristics, and for the same reasons that Alejandra is considered a vulnerable victim, they each equally support the application of the enhancement.

### 5. <u>Physical Restraint of Victim [U.S.S.G. § 3A1.3]</u>

Defendants Miriam, Angela, and Gabriel object to the application of a two-level upward adjustment based on the physical restraint of the victims in this case pursuant to U.S.S.G. § 3A1.1.  Defendant Angela contends that the enhancement is supported by insufficient evidence.  (Angela Brief at 14). Defendant Miriam claims that the enhancement should not be applied because locking up the victims at night and barricading their window does not "add[] appreciably to the seriousness of the offense."  (Miriam Brief at 7).  Defendant Gabriel argues that application of this enhancement is impermissible double

counting where a four-level enhancement for use of force has already been applied under § 2A3.1(b)(1), and that the government is somehow collaterally estopped from seeking this enhancement now because it was not applied to co-defendants Armando and Bonifacio with respect to victim Norma.  (Gabriel Brief at 11).  As set forth below, none of defendants' claims has any merit.

There is ample evidence to demonstrate that victims Karina/Alicia, Sandra/Vanessa, Alejandra, and Norma were physically restrained in this case.  "'Physically restrained' means the forcible restraint of the victim such as by being tied, bound, or locked up."  § 3A1.3, comment., note 1 (cross-referencing § 1B1.1, comment., note 1(L)).  Karina/Alicia and Sandra/Vanessa both testified that defendants Miriam and Gabriel physically restrained them by locking the internal hallway and kitchen door of the house at night and by placing a large, heavy bureau in front of the window of the girls' room.  (Tr. at 469-70, 476-78; Tr. at 615-17, 622-23).  Together, these actions blocked all routes of exit from the girls' bedroom.  (Id.; Govt. Trial Ex. 10 (diagram)).  In addition to the victims' testimony, the government introduced photographs of the lock on the kitchen door and the bureau in front of the bedroom window, which law enforcement agents found during a search of the apartment on December 20, 2006.  (Gov. Trial Exs. 5, 8).  The government also introduced a photograph of a wood bar that had been nailed into the track of the victims' bedroom window, which further prevented them from escaping, and which Jaime Reyes testified was not there when she rented the house to Miriam and Gabriel.  (Tr. at 469-70, 476-78; Tr. at 615-17, 622-23).  It is appalling that defendant

34

Miriam minimizes the seriousness of keeping these girls prisoner in her home by characterizing it as merely "holding the key" at night.  (Miriam Brief at 14).

Alejandra and Norma both testified that defendant Angela locked them into both the Commonwealth and the Hoover Street apartments at night, and that neither of them had a key to the locks.  (Tr. at 912-14, 1020, 1030-31).[10]  They also identified a photograph of the interior lock on the door of the Hoover Street apartment, which law enforcement agents found during a search of the apartment on December 20, 2006.  (Govt. Trial Ex. 108; Tr. at 661-62 (agent testimony re lock on door)).

Accordingly, there is clear and convincing evidence that, as a factual matter, these four victims were physically restrained during the commission of the offense.[11]  Any evidence, particularly "conflicting evidence," regarding cellular telephones and access to medical care (see Angela Brief at 14) is wholly irrelevant to whether these four victims were locked up at night.

Defendant Gabriel's legal argument against the physical restraint enhancement fares no better than defendants Miriam and Angela's factual objections.  Application of both the physical restraint and the use of force enhancements is not double

---

[10]    This testimony wholly defeats defendant Angela's claim that there is "no evidence" of a lock on the door at the Commonwealth apartment.  (Angela Brief at 14).

[11]    Indeed, victims Esperanza, Karina/Alicia, and Sandra/Vanessa were also physically restrained by defendant Gabriel when he sexually assaulted them.  See, United States v. Long Turkey, 342 F.3d 856, 859 (8th Cir. 2003) (holding victim down by her arms and hair and pinning her beneath defendant during intercourse constituted physical restraint under § 3A1.3).

counting.  Impermissible double counting occurs where one part of the Guidelines is applied to increase a defendant's punishment based on a kind of harm that has already been fully accounted for by the application of another part of the Guidelines.  United States v. Reese, 2 F.3d 870, 895 (9th Cir. 1993).  The use of a single aspect of defendant's conduct both to determine the applicable base offense level and to increase the base offense level is considered impermissible double counting only where, absent such conduct, it is impossible to come within that guideline.  Id.  On the other hand, if it is possible to be sentenced under a particular offense guideline without having engaged in a certain sort of behavior, such behavior may be used to enhance the offense level, "for in this situation, the guideline's base offense level will not necessarily have been set to capture the full extent of the wrongfulness of such behavior." Id. (citing United States v. Wright, 891 F.2d 209, 211 (9th Cir. 1989) (under escape guideline (§ 2P1.1), adjustment for having committed crime while "under sentence" (§ 4A1.1) did not result in impermissible double counting because being "under sentence" is not a necessary element of offenses covered by this guideline -- one may escape from pretrial custody)).[12]

---

[12]   See also United States v. Fisher, 132 F.3d 1327, 1328-29 (10th Cir. 1997) (enhancements for both injury to a victim and physical restraint of a victim not impermissible double-counting); United States v. Long, 977 F.2d 1264, 1277 (8th Cir. 1992) (under money laundering guideline (§ 2S1.1), increase for specific offense characteristic of having knowingly laundered drug money did not result in impermissible double counting because guideline applies "not just [to] the laundering of drug money, but [to] the laundering of any proceeds from a myriad of specified unlawful activities"); United States v. Lieberman, 971 F.2d 989, 992 (3d Cir. 1992) (under embezzlement guideline (§ 2B1.1), adjustment for abuse of trust (§ 3B1.3) did not result

1   Application of both the use of force and physical restraint
2   of a victim enhancements under § 2A3.1(b)(1) and § 3A1.3 is not
3   double counting.  United States v. Long Turkey, 342 F.3d 856, 859
4   (8th Cir. 2003).  Victim restraint is neither an element of
5   aggravated sexual assault, nor is it incorporated into the use of
6   force enhancement under the guidelines.  Id.; see also § 3A1.3,
7   comment., note 2.  It is possible to commit sex trafficking by
8   force, fraud, and coercion without physically restraining any
9   victim.  Plus which, each enhancement is supported by independent
10  evidence.  Any one of defendants' multiple threats of force
11  against the victims and their families, threats of selling the
12  victims to pimps, and the actual use of force during beatings
13  would support application of the four-level enhancement under
14  § 2A3.1(b)(1).  In contrast, any one occasion of actual physical
15  restraint of any one of Karina/Alicia, Sandra/Vanessa, Alejandra,
16  and Norma would support the two-level enhancement under § 3A1.3.
17  There is ample evidence of multiple instances of both types of
18  conduct.  Indeed, applying only a two-level increase appears to
19  under-count the number of victims who were restrained daily for
20  months.

21      Also, a defendant's conduct with respect to separate victims
22  can support multiple enhancements that could otherwise be
23  susceptible to a double counting claim.  United States v.

24  _____

25  in impermissible double counting because "abuse of position of
    trust is not included in the base offense level or specific
26  offense characteristic applicable to bank embezzlement")
    (citation omitted); United States v. Doubet, 969 F.2d 341, 347
27  (7th Cir. 1992) (under robbery guideline (§ 2B3.1), increase for
    specific offense characteristic of "physical restraint" did not
28  result in impermissible double counting because "robbery does not
    necessarily entail physical restraint").

Johnson, 444 F.3d 1026, 1030 n.5 (9th Cir. 2006) (bodily injury and physical restraint enhancements supported by bank robber's conduct against two different victims).  Thus, even if there were a risk of double-counting here (which there is not), the use of force and physical restraint enhancements here can be independently supported by reliance on defendants' conduct with respect to each victim.  For example, if the use-or-force enhancement were based on defendants' beating of Esperanza or threats of harm to victim Tania's daughter, the physical restraint enhancement would be separately supported by the virtual caging of Sandra/Vanessa and/or Karina/Alicia.

Even if the court accepted defendant Gabriel's argument that the USPO's failure to apply the enhancement for the physical restraint of Norma against defendants Bonifacio or Armando precluded its application here (an argument that should be rejected for reasons set forth below in Section III.A.2), there is plenty of support for the enhancement without any reference to Norma, and subtracting the two-level increase from Norma's group does not reduce defendant Gabriel's total offense level at all.

For all these reasons, the court should apply the physical restraint enhancement to all defendants.

### 6.   Obstruction of Justice [U.S.S.G. § 3C1.1]

Defendants Miriam, Angela, Maribel, and Gabriel object to the application of a two-level upward adjustment in offense level for obstruction of justice pursuant to U.S.S.G. § 3C1.1.  The application is based on defendants' obstructive behavior both during the conspiracy and following their arrest.  During the conspiracy, each defendant threatened the victims with dire

38

consequences should they report defendants' crimes to the police. (E.g., Miriam PSR ¶ 82).  Defendants Miriam and Angela also earned the obstruction enhancement by attempting to persuade and intimidate co-defendant Flor Morales Sanchez ("Morales") into withdrawing her guilty plea and refusing to testify at trial against the other defendants.  (E.g., Miriam PSR at ¶ 83). Although relied upon by the USPO, defendant Angela also qualifies for the enhancement through her post-arrest instruction that Morales lie to a defense investigator to exculpate defendants. (Tr. at 1511-14).

Defendants Miriam and Angela each objects that the enhancement based on her threats to the victims incorrectly double-counts the same conduct that is "inherent in the offense behavior."  (Miriam Brief at 8; Angela Brief at 14).  Defendant Miriam also objects that there is "no evidence" to support the enhancement based on threats made to Morales, and that Morales's own statements about defendants Miriam and Angela's obstructive conduct is not credible.[13]  (Miriam Brief at 8).  Defendants Angela and Gabriel object that the enhancement should not be applied because the threats to the victims were not "purposely calculated" to thwart the investigation (Angela Brief at 14; Gabriel Supp. Brief at 2), or were not made "willfully."  (Id.). Defendant Angela also suggests that the threats to the victims were concerned warnings about dangers for illegal aliens.

---

[13]  Defendant Angela does not appear to object to the application of the enhancement based on her efforts to intimidate Morales into withdrawing from her cooperation plea agreement, as defendant Angela's objections are solely addressed to the threats to prevent the victims from reporting her crimes to the police. (See Angela Brief at 14).

(Angela Brief at 14).  Defendant Maribel contends that there is
no evidence that she obstructed justice, and that she was not
involved in dissuading the other conspirators' victims from
reporting the crime.  (Maribel Brief at 10).[14]  Defendant Gabriel
also argues that the USPO should be precluded from applying the
enhancement because the USPO did not apply the enhancement to co-
defendants Armando and Bonifacio.[15]  (Gabriel Supp. Brief at 2).
Each of defendants' objections to the obstruction enhancement is
misplaced.

     First, as a factual matter, there is overwhelming evidence
before the Court that, during the conspiracy, each and every
defendant threatened at least one victim to prevent her from
disclosing defendants' crimes to the police.  The threats used
included threats of arrest, deportation, and violence to the
victims and their families:

     •    Defendant Miriam threatened victim Esperanza that
          if she told the police her true age (under 18), they
          would take her to jail (Tr. at 1158); threatened victim
          Sandra/Karina that her parents would be hurt if she
          said anything to the police (Tr. at 443); and
          threatened victim Alicia that it wouldn't do her any
          good to talk to the police (Tr. at 777 (defendants

───────────────

     [14]    See Section II.B.

     [15]    Defendant Gabriel's argument overlooks the fact that
whether or not the USPO is precluded from recommending the
enhancement, it will be the court that determines his final
sentencing guidelines calculations.  Certainly, in fashioning a
reasonable and just sentence for defendant Gabriel, the Court is
not precluded from finding that he obstructed justice due to the
USPO's prior recommendations regarding other defendants.

40

would eventually get her back, hit her, and continue
forcing her to work as prostitute)).

• As the FBI was knocking on the door, defendant
Gabriel threatened both victims Sandra/Vanessa and
Karina/Alicia that they should tell the police a
prepared story that did not incriminate him (Tr. at
516-17, 777). Defendant Gabriel also told
Karina/Alicia that it wouldn't do her any good to tell
the police the truth because he and defendant Miriam
would just get her and Sandra/Vanessa back, hit them
and continue forcing them to work as prostitutes. (Tr.
at 777).

• Defendant Angela threatened Norma that if she
talked to the police, her family would pay (Tr. at 904-
04). Defendant Angela threatened Alejandra that the
police would jail or deport her (Tr. at 1008; 1028),
and that if she told the police the truth, defendant
Angela would hurt Alejandra's family (Tr. at 1125-27).
Defendant Angela repeated these threats to Flor Morales
Sanchez, Norma, and Alejandra, and said that if they
told the police the truth, their families would "pay
the consequences." (Tr. at 1415-16).

• Defendant Maribel threatened Tania with calling
the police and said that they would deport her. (Tr.
at 1727-28, 1736). For these reasons, Tania never told
anyone in public that she was working as a prostitute
and never called the police for help. (Tr. at 1744,
1746.) Defendant Maribel explicitly told Tania that if

41

the police stopped her, she must tell the police that
she was working on her own. (Tr. at 1731). Defendant
Maribel also instructed Tania that she should give the
police a different name and present fake
identification, which defendant Maribel had acquired
and given to Tania. (Tr. at 1796-97).

• Defendant Gladys threatened Tania that the police
would deport her. (Tr. at 1775). Defendant Gladys
told Lupe that if she told the truth to the police or
testified against defendant Gladys, defendant Gladys's
brother Mael would kill Lupe (Tr. at 1812, 2229, 2344),
and defendant Gladys would kill Lupe's daughter (Tr. at
1812). Defendant Gladys gave Ingrid a false address to
provide to the police if she was ever arrested, and
instructed Ingrid not to tell the police about
defendant Gladys. (Tr. at 1358). Defendant Gladys
threatened Rosaura that if she told the police the
truth, they would deport Rosaura to Guatemala, where
defendant Gladys would find her and kill her. (Tr. at
2203). Defendant Gladys also intimidated her
bartender, Willian Morales, from reporting what he saw
to the police because he feared harm to himself and his
family. (Tr. at 2262).

The application notes to § 3C1.1 clearly define this conduct
as obstruction: "Obstructive conduct that occurred prior to the
start of the investigation . . . may be covered by this guideline
if the conduct was purposefully calculated, and likely, to thwart
the investigation or prosecution of the offense of conviction."

§ 3C1.1, comment., app. note 1.  As specific examples of covered conduct, the guidelines identify "threatening, intimidating, or otherwise unlawfully influencing a co-defendant [or] witness . . ., directly or indirectly, or attempting to do so;" and "threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction."  § 3C1.1, comment., app. note 4(a), (k).

Defendants' threats to the victims were not only purposely calculated and likely to succeed -- they did succeed.  On at least four occasions, defendants' victims came into contact with the police but failed to disclose defendants' crimes out of fear. First, when Tania was arrested along with defendant Maribel, Maribel's prostitute friend Blanca Leticia Ramirez-Lima ("Blanca"), and Maribel's two new victims, Carol and Lucy, Tania gave a fake name, presented the fake identification defendant Maribel had given to her, did not tell the police that she was being forced to prostitute herself -- all because of defendant Maribel's prior instructions and because defendant Maribel nearby and listening to what Tania said.  (Tr. at 1795-97).  Second, when Rosaura was arrested, she did not tell the police about defendant Gladys's threats or being forced to work as a prostitute, and gave them a false name, because defendant Gladys had warned Rosaura that the police would never believe her, and that, even if they did, Gladys would kill her.  (Tr. at 2162-64; 2203).  Third, in October 2006, when the police conducted a welfare check at defendant Angela's Commonwealth apartment, Norma and Alejandra lied to the police because they feared defendant Angela, as well as defendant Armando and Morales.  (Tr. at 955-

43

57, 1025, 1028).  Morales also lied to the police during the welfare checks because she feared defendant Angela.  (Tr. at 1438, 1505).  Fourth, on December 20, 2006, when defendants were arrested and the victims were finally free, many of the victims initially lied to the FBI out of fear of defendants.  For example, Sandra/Vanessa initially lied because she was afraid of Miriam.  (Tr. at 518).  Similarly, fearing retribution from defendants Miriam and Gabriel, upon Karina/Alicia's liberation, she, too, lied and gave a fake name to the police.  (Tr. at 778).

In addition to the above-described evidence, there is clear and convincing evidence that defendants Miriam and Angela also engaged in post-offense obstruction of justice.  While defendants Miriam and Angela were detained pending trial, together with defendant Maribel's mother, Maria Antonia Vasquez Valenzuela ("Sonia"), and Blanca, they frequently and repeatedly attempted to induce Morales into withdrawing from her cooperation plea agreement.[16]  (<u>See</u> Exs. G, H, I).  Although a separation order was in place, Morales individually came into contact with co-defendants Miriam and Angela while on the yard at the San Bernardino County Jail, where they pressured her not to cooperate with the government.  Defendant Miriam told Morales that she knew Morales was cooperating and had read all the reports of Morales's statements to the government.  She told Morales that defendant

---

[16]   The government attempted to elicit testimony from Morales at trial about defendants Miriam and Angela's intimidation after her arrest, which would have been subject to cross-examination by defendants.  Defendants, however, successfully objected to this line of questioning, thereby giving up their opportunity to cross-examine Morales on the subject.  (Tr. at 1679-84).

44

Gladys knew Morales had a "Plan A" (cooperation agreement with the government), but defendant Gladys had a "Plan B" (threat of harm). Defendant Miriam also told other inmates that Morales was "a rat." (Ex. G at 7734).

Defendant Angela exerted similar pressure on Morales, and enlisted the assistance of unindicted co-conspirators Blanca and Sonia. Blanca and Sonia repeatedly visited defendant Angela and Morales at San Bernardino County Jail, where they told Morales she should not cooperate with the government, that she was going to get a lot of jail time, that a defense investigator said that harm could come to Morales and her family due to her cooperation, and that people who cooperate with the government get killed. (Ex. G at 7735-36). Sonia and Blanca also used Morales's concern about her infant child against her. Sonia told Morales that her baby was going to be taken away from her; Blanca told Morales that she should be careful or she might lose her baby. Sonia and Blanca also urged Morales to write a letter to the judge requesting another attorney and an opportunity to withdraw her guilty plea or at least not cooperate against her co-defendants. They put money on Morales's books so that she could pay an inmate to write the letter for her. (Ex. G at 7737; Ex. K). Defendant Angela followed up with Morales to make sure she sent the letter to the judge. (Ex. H at 7741). Morales, however, instead used the money to pay a fellow inmate to write a letter to Morales's lawyer. (Ex. G at 7737). Morales's account of these events is credible because, not only was her testimony at trial credible despite exhaustive cross-examination (as demonstrated by the

45

jury's verdicts),[17] but her account here is also corroborated by documentary evidence.

These efforts to intimidate Morales, who proved to be a powerful witness against defendants, is the exact conduct contemplated by U.S.S.G. § 3C1.1. (See § 3C1.1, comment. (n. 4(a)) ("threatening, intimidating, or otherwise unlawfully influencing a co-defendant [or] witness . . ., directly or indirectly, or attempting to do so.")).

Defendant Angela also attempted to obstruct justice following her arrest when she telephoned Morales from custody and asked Morales to meet with and lie to a defense investigator in an effort to create false exculpatory evidence. (Tr. at 1511-14). This conduct, too, justifies application of the two-level enhancement under § 3C1.1.

As a legal matter, defendants' obstructive conduct is not "subsumed" in the offense, and application of the enhancement for obstruction of justice does not constitute impermissible double-counting. The offense of sex trafficking by force, fraud, and coercion does not necessarily require threatening victims not to report the crime to the police. It is quite possible to commit the offense, in fact, solely by use of force or fraud, without any threats at all, much less the specific threats at issue here. Accordingly, "the guideline's base offense level will not necessarily have been set to capture the full extent of the

---

[17]    In particular, the jury's verdict on count 17 (defendant Angela's forced prostitution of Alejandra and importation of Alejandra for purposes of prostitution) demonstrates that the jury believed Morales's testimony that, although she recruited Alejandra, she did so at defendant Angela's direction.

wrongfulness" and application of the enhancement is not impermissible double-counting. <u>Reese</u>, 2 F.3d at 895 (9th Cir. 1993). Moreover, as with the physical restraint and use of force enhancements, defendants' conduct with respect to any one victim can independently provide a basis for the obstruction enhancement, while their general conduct regarding the other victims provides the factual support for the base offense level.

Finally, the fact that the obstruction enhancement was not applied to defendant Bonifacio, and may not be applied to defendant Armando, has no preclusive effect on the determination of the appropriate guidelines range for each of the defendants now before the court. Defendants Miriam and Gabriel have provided no authority for this absurd proposition, nor can they. Even if the court were to consider the co-defendants' sentences in analyzing the 18 U.S.C. § 3553(a) factors,[18] it must first independently determine -- and consider -- the applicable guidelines range for each defendant. For the reasons set forth above, that range must include a two-level upward adjustment of offense level for obstruction of justice under U.S.S.G. § 3C1.1.

**7.   Aggravating Role [U.S.S.G. § 3B1.1]**

Pursuant to U.S.S.G. § 3B1.1(a), the Court should apply a four-level upward adjustment "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The USPO applies this enhancement to defendants Gladys and Angela. (Gladys PSR ¶ 83;

---

[18]   <u>See</u> Section III.A.2 (co-defendants' sentences cannot establish unwarranted sentencing disparity, and there is no nationwide disparity posed by the life sentences sought here).

Angela PSR ¶ 87).  Defendant Gladys does not object.  Defendant
Angela objects to the leadership role enhancement on two grounds:
(1) that there were not five participants in the sex trafficking
conspiracy; and (2) that there is insufficient evidence that
defendant Angela directed the activities of co-defendants Pablo
Bonifacio ("Bonifacio") and Luis Armando Vicente ("Armando").
(Angela Brief at 13).[19]  Both are without merit.

As for the number of participants in the criminal activity,
defendant Angela quite rightly notes that a participant must be
criminally responsible for the commission of the offense and that
victims such as Alejandra and Norma should not be counted as
participants in the sex trafficking organization.  U.S.S.G.
§ 3B1.1 comment. (n. 1) ("A 'participant' is a person who is
criminally responsible for the commission of the offense . . .
."); cf. United States v. Egge, 223 F.3d 1128, (9th Cir. 2000)
(holding that customers of a seller convicted of distributing
drugs are not "participants" because they are not criminally
liable for the distribution of controlled substances).
Nonetheless, defendant Angela misses the fact that she played a
leadership role in her family's vast business of sex trafficking,
which included, as the PSR notes, the nine defendants charged in
the Second Superseding Indictment, at least four unindicted co-
participants in Guatemala (Chepe, Narcy/Nancy, Tio, and Johanna),
driver Joaquin Huerta, and bartender Willian Morales.  (PSR
¶ 87).  Moreover, this roster of far more than five participants

---

[19]    Defendant Angela also notes that no role enhancement
has been recommended for defendants Miriam and Maribel.  (Angela
Brief at 13).  But this statement appears not to be so much of an
objection as it is simply an observation of fact.

is fairly conservative, as it does not include the untold number
of alien smugglers who brought the victims from Guatemala to the
United States, the various other drivers used by the defendants
to transport the girls (including Juan Montes, who testified at
trial), or the various prostitutes who assisted the defendants
with the victims (including defendant Maribel's prostitute friend
Blanca, who assisted in beating Esperanza and threatening
Tania).[20]

The fact that defendant Angela did not direct all of these
members and participants in the Vasquez Valenzuela business, does
not in any way affect the applicability of the role enhancement,
because the Ninth Circuit has made clear that a leadership
enhancement under § 3B1.1(a) "does not require control over all
the five or more participants." United States v. Garcia, 497
F.3d 964, 970 (9th Cir. 2007). Thus, defendant Angela's focus on
the number of participants in the sub-group she led is incorrect
as a matter of law. Moreover, even if defendant Angela's
subgroup were the proper focus of the analysis, as a factual
matter, defendant Angela's subgroup did consist of at least five
participants, including: (1) defendant Angela; (2) cooperating

_____

[20]   Given the extensive number of criminal participants and
their varied roles, the international nature of the sex
trafficking business, the large number of victims affected by the
Vasquez Valenzuela family, and the huge amounts of money raised
by having numerous victims charging up to 30 clients per day $80
for 15 minutes of sex, it is clear that the defendants' sex
trafficking activities were also "otherwise extensive," which
thus renders the objection to the number of participants moot.
Cf. United States v. Rose, 20 F.3d 367, 373 (9th Cir. 1994)
(holding that enhancement for "otherwise extensive" activity in a
fraud scheme should be applied based on consideration of (1) the
number of knowing participants and unwitting outsiders, (2) the
number of victims, and (3) the amount of money obtained) (citing
cases).

49

co-defendant Flor Morales Sanchez; (3) co-defendant Bonifacio; (4) co-defendant Armando; (5) another driver for Angela named Luis (Tr. at 892, 895, 901); and (6) defendant Gladys, who, at defendant Angela's insistence, took possession of victim Kathy because defendant Angela thought she was "so old."[21]  (Tr. at 1789, 2170-71).

Defendant Angela is also mistaken factually with respect to her claim that she did not direct the activities of co-defendants Bonifacio and Armando.  Implicit in her objection is an acknowledgment that she directed the activities of Morales, which alone might support the leadership enhancement.  United States v. Barnes, 993 F.2d 680, 685 (9th Cir. 1993) (holding that "[t]he fact that [the defendant] did not supervise more than one participant does not preclude the enhancement [under § 3B1.1(b)] as a matter of law.").  But the record also amply supports the conclusion that defendant Angela played a leadership role with respect to co-defendants Bonifacio and Armando (as well as a driver named Luis), who drove Angela's girls around (Tr. at 892, 895, 901, 1952, 1958).  Co-defendant Armando was also tasked with keeping an eye on the girls for Angela (Tr. at 2431) and telling the victims that they need to pay Angela (Tr. at 1008).

Accordingly, defendant Angela's objections to the role enhancement under U.S.S.G. § 3B1.1 should be rejected, and the Court should apply the four-level enhancement.

---

[21]   The fact that defendant Gladys was also a leader in the organization does not diminish defendant Angela's role as a leader.  United States v. Barnes, 993 F.2d 680, 685 (9th Cir. 1993) ("[T]he fact that one of [the] co-defendants occupied a leadership role in the enterprise does not preclude [defendant] from also occupying an organizational role as well.").

8.   <u>**Mitigating Role [U.S.S.G. § 3B1.2]**</u>

Defendants Gabriel and Maribel claim that they should be entitled to an offense level reduction for their purported lesser roles in the sex trafficking conspiracy.  Section 3B1.2 provides that if a defendant was a minor participant in the criminal activity, the offense level should be reduced by two levels, and if the defendant was a minimal participant, there should be a 4-level reduction.  U.S.S.G. § 3B1.2.  "The defendant bears the burden of proving by a preponderance of the evidence that he [or she] is entitled to a downward adjustment based on role in the offense."  <u>United States v. Pena-Gutierrez</u>, 222 F.3d 1080, 1091 (9th Cir. 2000).  Moreover, the Ninth Circuit "has consistently stated that a downward adjustment under section 3B1.2 is to be used infrequently and only in exceptional circumstances."  <u>Id.</u>

With respect to being a "minor participant," the Ninth Circuit has indicated "that a minor role adjustment is warranted only if the defendant is substantially less culpable that his co-participants."  <u>Id.</u>  A reduction for being a "minimal participant" may only occur where the defendant's "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others indicates that he [or she] is plainly among the least culpable of those involved in the conduct of the group."  <u>United States v. Awad</u>, 371 F.3d 583, 591 (9th Cir. 2004).

Here, defendant Gabriel claims that he is entitled to a 2-level minor role reduction because: (1) he did not "operate the prostitution ring;" (2) he did not solicit the victims; and (3) he purportedly had additional employment as a construction

worker.[22]   But defendant Gabriel acted as a co-equal of his

female partner in crime, defendant Miriam.   Although defendant

Gabriel did not have any contact with the victims before they

arrived in the United States, he was involved in the conspiracy

from the moment they arrived, picking up Esperanza (Gabriel PSR

¶ 48) and Sandra/Vanessa from the alien smugglers.   (Gabriel PSR

¶ 54; Tr. at 427).[23]   Defendants Gabriel and Miriam together

delivered the news to the victims that they were brought to the

United States to work as prostitutes.   (Tr. at 438-39; 699-700).

The victims worked as prostitutes because they feared both

defendants Miriam and Gabriel.   (See, e.g., Tr. at 440, 701).

Defendants Miriam and Gabriel together put the locks on the doors

and moved the dresser in front of the window to keep the victims

hostage.   (Gabriel PSR ¶ 57; Tr. at 471, 476-78, 765, 770-71,

818).   Defendants Gabriel and Miriam jointly sold Sandra/Vanessa

and Karina/Alicia to Rampa and his friend for a horrific night of

rough sex.   (Gabriel PSR ¶¶ 52, 54; Tr. at 485-89, 735-36).

Defendant Gabriel personally used force on the victims, including

sexual assaults and rape.   (Gabriel PSR ¶¶ 48, 52, 54; Tr. at

---

[22]   Defendant Gabriel also suggests that he is entitled to
a minor role reduction because the government agreed to role
reductions for co-defendants Bonifacio and Armando.   (Gabriel
Brief at 6-8).   This faulty contention is addressed in Section
III.A.2 regarding the defendants' claims of sentencing disparity.
But even if some sentencing disparity were present, the mere fact
of a disparity does not relieve defendant Gabriel of his burden
to establish that he was, in fact, a minor participant.   More to
the point, there is no evidence in the record that defendants
Bonifacio and Armando ever engaged in the types of sex
trafficking conduct (or participated to the same degree) as did
defendant Gabriel, as is set forth in detail above.

[23]   Defendant Gabriel was not acting merely as a driver
here, as a person named "Alfredo" drove defendants Gabriel and
Miriam to pick up Sandra/Vanessa.   (Tr. at 427).

481-85, 732-35, 1185-86).  Defendant Gabriel threatened the

victims with a gun.  (Tr. at 507-08, 771).[24]  And on the day his

victims were rescued by law enforcement, defendant Gabriel warned

them not to tell the FBI the truth.  (Tr. at 777).  There can be

no serious doubt that defendant Gabriel was a substantial and

integral member of the sex trafficking conspiracy, and his

cowardly attempt to recast himself as a doting and loyal man

servant and driver for the Vasquez Valenzuela women must be

rejected.[25]

Furthermore, defendant Gabriel's contention that he may have

had other gainful employment is beside the point.  The existence

of a legitimate job in construction does not exclude defendant's

integral participation in sex trafficking.  Furthermore, the

trial record shows that, while defendant Gabriel may have worked

in construction early on, that gainful employment abated over

time as the Vasquez Valenzuela sex trafficking business

expanded.[26]  (Tr. 613-14, 621-22).  In any event, regardless of

_____

[24]  Defendant Gabriel's significance in the conspiracy is
also demonstrated by the fact that the victims referred to him
more formally, as "Mr. Gabriel" or "Don Gabriel," while the
victims referred to the female defendants by first name.  (See,
e.g., Tr. at 431, 447, 448, 724, 769, 771, 779, 790).

[25]  Even if the Court were to accept defendant Gabriel's
re-characterization of his role as mere driver, it would still be
insufficient to support a minor role reduction.  E.g., United
States v. Hernandez-Franco, 189 F.3d 1151, 1160 (9th Cir. 1999)
(finding no minor role where defendant transported aliens as part
of alien smuggling organization but was not involved in making
smuggling arrangements for the aliens or play a leadership role);
United States v. Pinkney, 15 F.3d 825, 828 (9th Cir. 1994)
(finding no minor role for getaway driver who did not plan or
actually participate in the bank robbery).

[26]  Defendant Gabriel has in no way rebutted this proof or
otherwise provided any evidence to support his claim of gainful
employment.  He has provided no business records, pay stubs,

53

any part-time construction work, defendant Gabriel falls far
short of the required showing that he was a substantially less
culpable participant in the sex trafficking conspiracy.  Thus,
defendant Gabriel is not entitled to a minor role reduction.

Nor is defendant Maribel.  She argues that she did no more
than the "mechanical tasks" detailed in the probation report
(thereby implicitly conceding those factual allegations) (Maribel
Brief at 11), but defendant Maribel's role in the offense as set
forth in her PSR actually establishes beyond dispute that she
played a vital role in the sex trafficking conspiracy and was not
substantially less culpable than her cohorts.  As is outlined in
the PSR, defendant Maribel first broke the news to Esperanza that
she would have to work as a prostitute and helped alter
Esperanza's appearance; chased down and beat Esperanza after she
tried to escape; forced Tania into prostitution by means of
threats and freely traded her with defendant Gladys; managed to
round up the whole family to assist in hunting down Tania after
her escape; assisted in picking up others victims delivered by
alien smugglers; and kept Tania from reporting the family to the
police when they were arrested.  (Maribel PSR ¶¶ 42-47).
Moreover, at trial it was established that defendant Maribel had
forced two additional victims -- Lucy and Carol -- into
prostitution.  (Tr. at 1794-95).  It was also established at
trial that defendant Maribel had arranged for and obtained yet

documents, or even the testimony of any other witness.  Although
defendant Gabriel has submitted letters from friends that state
he worked in construction, the letters are completely vague as to
the time period that he did so or the amount of work that he did,
and thus are not inconsistent with the testimony at trial.

another victim named Marlene to come work for her.  (Tr. at 431-33).

Based on all of the foregoing, defendant Maribel has not shown -- indeed, cannot show -- that she was a minor participant meriting a two-level reduction.  And for those reasons, it is all the more clear that defendant Maribel has failed to demonstrate a "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others" to indicate that she "is plainly among the least culpable of those involved in the conduct of the group."  <u>Awad</u>, 371 F.3d at 591.  Defendant Maribel thus fails to carry her burden to show that she deserves a 4-level reduction as a minimal participant, or even a 2-level reduction as a minor participant.

**9.   <u>Multiple Count Adjustment [U.S S.G.  § 3D1.4]</u>**

Defendants Angela and Gabriel each object to the five-level enhancement to the extent they are held accountable for conduct that pertains to other victims, though they do not object to the manner in which the multiple victim enhancement was calculated otherwise.  (Angela Brief at 15; Gabriel Brief at 11-12).[27]

---

[27]    Under § 3D1.4, the victim which has the highest offense level is the starting point, and that offense level is increased depending on the number and severity of other counts of victims. Here, that is victims Alejandra and Karina/Alicia.  Section 3D1.2 states that no offenses are to be grouped under Chapter Two, Part A, therefore because § 2A3.1 applies to defendants, none of the offenses group.  Therefore to determine the combined offense level here, 1 Unit should be counted for each of Alejandra, Karina/Alicia, Sandra/Vanessa, Rosaura, Esperanza, and Norma, because the offense levels supported by each of them are within four levels as serious as the most serious offense level. U.S.S.G. § 3D1.4(a).  One half of a Unit should be counted for each of Ingrid, Kathy, Lupe, and Tania, given that the offense levels attributed to the latter four were between five and eight levels less serious than the most serious offense level. U.S.S.G. § 3D1.4(b).  This results in a total of eight Units,

Defendant Angela objects to including certain victims because she "had no interaction with [certain victims] and nothing [she] did affected" those victims, and therefore, she argues, those victims should be eliminated from the multiple count analysis. (Angela Brief at 15). Defendant Angela again misapprehends what relevant conduct is under the Guidelines. Defendant Angela was well aware of the conduct of other co-defendants convicted of the same conspiracy in which she knowingly joined, and would in fact encounter them at Alvarado Street. The other victims suffered at the hands of those other members of the conspiracy, which was reasonably foreseeable to her. She is therefore accountable for the conduct of the entire conspiracy, including the conduct affecting each of the victims. (See Section II.B.).

Defendant Gabriel simply argues that because it was not applied to defendants Bonifacio or Luis Vicente Vasquez, it should not apply to him, and objects to its application because it would overstate the culpability of the defendants who went to trial. (Gabriel Brief at 11-12). At the time those defendants had been sentenced, the extent, nature, and connection of the overall conspiracy had not been established, these other defendants were not convicted under 18 U.S.C. § 1591, and the PSRs are explicit that those defendants, though aware of certain

---

which yields a five-level increase under § 3D1.4 because the result is more than five Units. Therefore, the combined offense level is reached by taking the offense level applicable to the Group with the highest offense level and increasing it here by five levels because there are more than five Units involved. U.S.S.G. § 3D1.4. Accordingly, each defendant receives a five-level increase to his or her offense level.

aspects of the conspiracy, were not as culpable as the defendants who brought the victims into the country, held them against their will, and forced them into prostitution.  (Armando PSR ¶ 65; Bonifacio PSR ¶ 59).  (See section III.A.2.).  The application of the five-level enhancement for multiple counts is thus fair and just as applied to each of the five defendants who went to trial.

**F.   Defendants' Challenge to the Empirical Basis of the Guidelines Fails**

Defendants Angela and Gladys challenge the 2007 amendments to the guidelines in this case because they argue that the amendments are based on a directive from Congress, but not on empirical data.  (Angela Brief at 19-20; see Gladys Brief at 14).  Defendant Miriam also makes a bare claim that the sex trafficking guidelines are not based on empirical data.  (Miriam Brief at 9).

First, defendants offer no reason why a directive from Congress is an insufficient basis to increase the penalties in corresponding guidelines.  Nor do they analyze any facts on which Congress acted.[28]

Second, defendants Angela and Gladys discuss how the base offense level for § 2G1.1 was amended.  (Angela Brief at 19; see Gladys Brief at 14).  That is not, however, the guideline that determines defendants' applicable base offense level nor the specific offense characteristics here.  It is instead § 2A3.1, to

---

[28]   Congress has, in fact, considered on many occasions the empirical facts pertaining to human trafficking, for example in its report Trafficking Victims Protection Reauthorization, House Report 109- 317, at 2 (2005) ("The United States Government currently estimates that 600,000 to 800,000 individuals are trafficked across international borders each year and exploited through forced labor and commercial sex exploitation. An estimated 80 percent of such individuals are women and girls.").

which the cross-reference in § 2G1.1 points, and the cross-reference to § 2A3.1 existed before this change to the base offense level of § 2G1.1 occurred.

Third, defendant Angela states only that "U.S.S.G. § 2A3.1 was amended" (Angela Brief at 19), but fails to mention that it did not increase the applicable base offense or applicable enhancements for her.  The 2007 amendments do not change the offense level for defendants' conduct:  a base offense level of 30 applies to defendant Angela's conduct both before and after the amendment.  U.S.S.G. § 2A3.1, Historical Notes to 2007 Amendments.  The only change was that a base offense level of 38 applies to conduct described in 18 U.S.C. § 2241(c), which involves knowingly engaging in a sexual act with a minor and is not at issue for defendants.  Id.  No other enhancements applicable to any defendant were added in the 2007 amendments.

Defendants' challenge the 2007 amendments to the Guidelines therefore is irrelevant and should be rejected.

**III.**

**DEFENDANTS' NON-GUIDELINES ARGUMENTS**

**A.   Claims Raised By Multiple Defendants**

**1.   "Sufficient, But Not Greater Than Necessary"**

The defendants all argue or suggest that the statutory mandatory minimum sentence of fifteen years' imprisonment is "sufficient, but not greater than necessary" to achieve the goals of sentencing.  Defendants, however, ignore the fact that one single act of forced prostitution of one victim triggers the statutory mandatory minimum sentence of 15 years' imprisonment.  Here, defendants forced at least ten victims to prostitute

themselves multiple times daily for a period of anywhere from
several months to two years.  A sentence ten times the mandatory
minimum would not be greater than necessary under these
circumstances.  As set forth herein and in the Government's
Omnibus Position re Sentencing, anything less than lifetime
imprisonment is not sufficient to punish defendants, protect
society from defendants' high risk of recidivism, and provide
adequate deterrence.

Defendant Gladys also claims that, by offering a plea
agreement that contemplated a sentence of less than life, the
government conceded that a lower sentence was "sufficient, but
not greater than necessary" to address defendant Gladys's crimes.
(Gladys Brief at 9-11).  This position misconstrues the
government's plea offer, as well as the nature of the plea
bargaining process.  First, although the government did extend a
package deal plea offer to all five defendants prior to trial, in
an effort to conserve government and court resources, to secure
convictions for all defendants, and, most importantly, to spare
the victims the trauma of testifying in open court and re-living
the nightmare they endured at defendants' hands, the agreement
did not stipulate to a sentence.  (See, Gladys Brief Ex. 3 at
¶ 14 ("Defendant and the USAO . . . further reserve the right to
argue for a sentence outside the sentencing range established by
the Sentencing Guidelines.").

Second, even if the offer did contain an agreed-upon
sentence, that sentence would not be a binding representation of
what the government believes is an appropriate sentence for
defendants' offense -- it would be a sentence that the government

could tolerate in order to guarantee the conviction of all
defendants, conserve resources, and avoid futher trauma and
humiliation for the victims.   Making such an offer in no way
places a ceiling on the sentence the government may seek -- or
the court may impose -- once the plea agreement has not been
accepted.   See United States v. Narramore, 36 F.3d 845, 847 (9th
Cir. 1994) .

    **2.**   **There is No Unwarranted Sentencing Disparity**

    Defendants Gladys, Angela, Gabriel, and Maribel contend that
the imposition of a within-guidelines life sentence would create
an unwarranted sentencing disparity between him/herself and co-
defendants Cristina, Armando, Bonifacio, and Morales, each of
whom pleaded guilty prior to trial and received a lower sentence
(or a lower recommended sentence, in the case of defendant
Armando, who has not yet been sentenced).   (Gladys Brief at 4-11;
Angela Brief at 24; Gabriel Brief at 17-19; Maribel Brief at 16-
18).   This argument fails, first, because the issue of
"disparity" is a nationwide analysis, not one within a single
case.   Even within this one case, though, there are several
reasons that any disparity among these groups of defendants is,
in fact, warranted:   (1) the defendants who pleaded guilty prior
to trial were convicted of different offenses than these
defendants; (2) the defendants who pleaded guilty prior to trial
were less culpable than these defendants; (3) defendant Morales
provided substantial assistance to the government; and
(4) entering a guilty plea prior to trial is an accepted basis
for leniency.

    The Ninth Circuit has recognized that the purpose of

60

1    § 3553(a)(6)'s requirement that district courts consider "the

2    need to avoid unwarranted sentence disparities" was to promote

3    national uniformity in sentencing rather than uniformity among

4    co-defendants in the same case.  United States v. Saeteurn, 504

5    F.3d 1175, 1181-82 (9th Cir. 2007).  Post-Booker, the guidelines

6    "still remain an essential tool in creating a fair and uniform

7    sentencing regime across the country."  United States v.

8    Mykytiuk, 415 F.3d 606, 607 (7th Cir 2005).  Moreover, a within-

9    guidelines sentence is unlikely to create a sentencing disparity

10   because the guidelines "represent[] the sentence that most

11   similarly situated defendants are likely to receive."[29]  United

12   States v. Becerril-Lopez, 541 F.3d 881, 895 (9th Cir. 2008).

13        Even in the microcosm of the instant case, though, there is

14   not unwarranted disparity.  The sentences of co-defendants

15   Cristina, Armando, Bonifacio and Morales cannot set the benchmark

16   for defendants now before the court because they are not

17   similarly situated in any way.  Co-defendants Cristina, Armando,

18   Bonifacio, and Morales all pleaded guilty prior to trial, and did

19   so pursuant to plea agreements with the government that

20   restricted the government's ability to seek higher sentences.

21

22        [29]    A sentence of life imprisonment for all five trial
23   defendants here would create no disparity with sentences in other
     sex trafficking cases nationwide involving 18 U.S.C. Section
24   1591.  In United States v. Norris, et al., No. 1:05-CR-479-JTC
     (N.D. Ga.), the one defendant who went to trial was sentenced to
25   life imprisonment (Docket No. 372), and in United States v.
     Carreto, et al., No. 08-140(S-1)(FB) (E.D.N.Y.), of the three
26   defendants who went to trial , two were sentenced to fifty years
     imprisonment and one was sentenced to twenty-five years
27   imprisonment (Docket Nos. 108, 111, and 114).  As those cases
     involved fewer defendants and fewer victims than this case, a
28   sentence of life imprisonment is warranted here.

61

The Supreme Court has long recognized the importance of such plea bargains to the criminal justice system.  <u>Santobello v. New York</u>, 404 U.S. 257, 260 (1971) ("'[P]lea bargaining[]' is an essential component of the administration of justice.  Properly administered, it is to be encouraged.  If every criminal case were subjected to a full-scale trial, the States and the Federal Government would need to multiply by many times the number of judges and court facilities.").  "Plea bargaining flows from 'the mutuality of advantage' to defendants and prosecutors, each with his own reasons for wanting to avoid trial," and is constitutionally legitimate.  <u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 361-32, 364 (1978).

Where one defendant entered into a plea agreement with the government and another did not, different sentences do not amount to an "unwarranted" sentencing disparity.  <u>United States v. Gonzalez-Zotelo</u>, 556 F.3d 736, 740-41 (9th Cir. 2009) (district court could not reduce sentence under 3553(a)(6) based on differences in sentence of defendant who did not receive a fast-track plea offer and another defendant who did); <u>see also</u>, <u>United States v. Shabani</u>, 48 F.3d 401, 404 (9th Cir. 1995) (no unwarranted disparity where co-defendants had pleaded guilty and cooperated).  Such differences are "justified by the benefits gained by the government when defendants plead guilty early." <u>Gonzalez-Zotelo</u>, 556 F.3d at 739.  The Ninth Circuit has also acknowledged that:

> The government may encourage plea bargains by offering leniencey to those who enter pleas.  Failure to offer leniency to those who [have not] is unequivocally . . . constitutionally proper.

1   <u>Narramore</u>, 36 F.3d at 847 (citations and quotations omitted).

2   Accordingly, higher sentences for the defendants here who

3   proceeded to trial in the hopes of avoiding any sentence at all,

4   compared to co-defendants who accepted responsibility and pleaded

5   guilty early does not create an unwarranted disparity.

6        The trial defendants are also dissimilarly situated from the

7   co-defendants who pleaded guilty prior to trial because they were

8   convicted of different offenses.  Each of the trial defendants

9   was convicted of sex trafficking by force, fraud, and coercion,

10  under 18 U.S.C. § 1591.  In contrast, the co-defendants were

11  convicted of less serious offenses.[30]  On this basis alone, a

12  higher sentence for the trial defendants is reasonable and

13  necessary.  See <u>United States v. Banuelos-Rodriquez</u>, 215 F.3d

14  969, 978 (9th Cir. 2000) (holding that the law of the Ninth

15  Circuit is that "the equalization of sentences is an improper

16  ground for departure if the court is attempting to equalize the

17  sentences of co-defendants who are <u>convicted</u> of committing

18  <u>different</u> offenses, even if their behavior was similar" (emphasis

19  in original)); <u>United States v. Changa</u>, 901 F.2d 741, 743-44 (9th

20  Cir. 1990) (no disparity where co-defendants convicted of

21  different crimes).  The fact that the co-defendants accepted

22  responsibility for their offenses, and co-defendant Morales

23  cooperated with the government, also justifies significantly

24

25        [30]   Co-defendants Cristina, Armando, and Bonifacio pleaded
26  guilty to conspiracy (18 U.S.C. § 371) and importation of aliens
    for purposes of prostitution (8 U.S.C. § 1328); co-defendant
27  Morales pleaded guilty to conspiracy (18 U.S.C. § 371),
    interstate transportation of a minor (18 U.S.C. § 2423(a)), and
28  importation of aliens for purposes of prostitution (8 U.S.C.
    § 1328).

different sentences for the defendants who went to trial.  See United States v. Troiano, 258 Fed. Appx. 983, 987, 2007 WL 4385506, at *3 (9th Cir. Dec. 12. 2007) (unpublished decision) (rejecting due process and equal protection argument raised by defendant who "was sentenced to 288 months while his co-conspirator, who pleaded guilty and cooperated with the prosecution, was sentenced to 80 months in prison").[31]

The defendants who proceeded to trial also played a more significant role in the offense than those who entered early guilty pleas.  Defendants Gladys, Miriam, Angela, and Maribel were all active in the recruitment of new victims to come to the United States from Guatemala.  Defendant Gladys was the leader of the entire organization and the enforcer of discipline across the segments of the conspiracy.  Defendant Angela contolled a sub-group within the conspiracy.  Defendants Miriam and Gabriel exploited multiple minor victims and kept them physically restrained.  Defendant Gabriel used sexual violence to subdue and control the minor victims.[32]  Defendant Maribel possessed her own

---

[31]    Defendant Gabriel also misinterprets the government's statement in its sentencing brief regarding defendant Bonifacio that a 33-month sentence "would minimize the risk of sentencing disparity."  (Gabriel Brief at 6).  A 33-month sentence for defendant Bonifacio, which was the low-end of the sentencing range, would minimize the risk of an unwarranted sentencing disparity compared to other defendants convicted under 8 U.S.C. § 1328, who played a minimal role in the offense, and who entered guilty pleas prior to trial.  For the reasons set forth above, defendant Gabriel is simply not similarly situated to such defendants.

[32]    Defendant Gabriel submits his attorney's declaration regarding an alleged conversation with a former prosecutor to suggest that defendant Gabriel was less culpable than the other defendants.  Even if counsel's memory of the conversation were accurate, however, the statements were made very shortly after defendants were arrested and before the government was aware of

sub-group of victims and instigated the brutal beating of Esperanza.  Defendants Bonifacio and Armando were primarily drivers for the organization, although they also performed guarding functions and Armando threatened victims.  Defendants Bonifacio and Armando's reduced roles in the offense were reflected in the government's stipulation to role reductions in each of their plea agreements.[33]  Defendant Cristina was significantly culpable, but her role was limited by her age and feeble nature.  These different roles in the offense render "warranted" any differences in the terms of imprisonment for the trial defendants as compared to the defendants who pleaded guilty.  See e.g., United States v. Ebbers, 458 F.3d 110, 129 (2d Cir. 2006) (affirming defendant Bernard Ebbers's considerably higher sentence than his codefendants' because he "had primary responsibility for the fraud," each codefendant "was a subordinate of Ebbers," and his codefendants' decisions to plead guilty and cooperate); United States v. Lindblad, 254 Fed. Appx. 647, 650, 2007 WL 4039782, at *1 (9th Cir. Nov. 16, 2007) (affirming defendant's sentence of 360 months in child exploitation case where guideline range was 235-293 months, despite difference between his sentence and codefendants' sentence where defendant was "dissimilar to his co-defendants in several material respects").  In light of the different offenses

_____

the full details of defendant Gabriel's involvement in the conspiracy.  As the Court is aware, the trial testimony graphically established that defendant Gabriel was equally if not more culpable than the female defendants.

[33]   Defendant Bonifacio received a four-level reduction for minimal role; defendant Armando received a two-level reduction for minor role.

65

of conviction and levels of culpability, comparing the sentences for defendants Miriam, Angela, Gabriel, and Maribel to those of defendants Cristina, Armando, Bonifacio, and Morales is the quintessential comparison of apples to oranges.

Defendant Gladys suggests that a life sentence is unfair to her because she purportedly wanted to accept the government's most favorable pre-trial plea offer, which was a package deal for all defendants, but was unable to do so because her co-defendants were not also willing to plead guilty.  But there is no constitutional right to a plea bargain at all.  United States v. Estrada-Plata, 57 F.3d 757, 760 (9th Cir. 1995).  The government may offer whatever terms it wishes.  It may refuse to bargain, and may cut off or limit negotiations.  United States v. Herrera, 640 F.2d 958, 962 (9th Cir. 1981); see also United States v. Osif, 789 F.2d 1404, 1405 (9th Cir. 1981) ("the government is . . . under no obligation to reoffer an agreement that was previously rejected and [a defendant] has no right to the plea agreement that he was originally offered.").  For the same reasons, defendant Angela's complaint that she repeatedly requested a plea agreement, only to receive a package plea offer on the eve of trial and see it be withdrawn after co-defendants refused its terms (Angela Brief at 21), demonstrates no improper conduct by the government nor any reason for leniency.

Defendant Gabriel complains that, having failed to successfully negotiate a plea agreement with the government to procure a lesser sentence, he is being penalized for exercising a

1  constitutional right.[34]  But there is no right to a plea offer,

2  Estrada-Plata, 57 F.3d at 760, and the failure to offer lenience

3  to defendants who do not enter guilty pleas is "unequivocally

4  . . . constitutionally proper."  Narramore, 36 F.3d at 847.

5  Indeed, filing an indictment with more serious charges after

6  failed plea negotiations is also constitutionally acceptable.

7  United States v. Goodwin, 457 U.S. 368, 384 (1982); United States

8  v. Gamez-Orduno, 235 F.3d 453, 462 (9th Cir. 2000) (not due

9  process violation).  Defendant Gabriel's letter to the court also

10  demonstrates that his decision to go to trial was not only

11  prompted by his reluctance to testify against defendant Miriam,

12  but by a desire to avoid spending the majority of his life in

13  jail.  (Gabriel Letter at 2) ("I hoped that I would get a plea

14  deal similar to that of Pablo Bonafacio [sic].  When the

15  prosecutor refused to do that, I tried to at least get a plea

16  agreement where I would not spend the majority of my life in

17  jail.  It was only after those requests were denied that I felt

18  no other choice but to go to trial.").

19  _____

20      [34]    In support of this claim, defendant submits his
   attorney's declaration regarding defendant's reasons for
21  declining the government's plea offer.  (According to counsel's
   declaration, defendant declined to plead guilty prior to trial
22  because he did not want to cooperate against co-defendant Miriam.
   Counsel's declaration, however, omits any reference to the two
23  plea offers extended by the government that did not contain any
   cooperation requirement.)  The submission of this declaration
24  constitutes a waiver of the attorney-client privilege.  Weil v.
   Investment/Indicators, Research & Management, Inc., 647 F.2d 18,
25  23 (9th Cir. 1981) (voluntary disclosure of the content of a
   privileged attorney-client communication constitutes waiver of
26  the privilege as to all other communications on the same
   subject).  The Court should either strike and disregard counsel's
27  declaration or permit the government to cross-examine defendant
   and counsel about defendant's reasons for declining the
28  government's multiple plea offers -- including those that did not
   contain a cooperation clause.

Moreover, for policy reasons, the court should not impose a sentence equal to that contained in any of the plea offers.  The court should "show respect for the plea process.  Obviously, if a court sentences defendant to the same sentence he would have had, had he taken a plea agreement, then there is no compelling reason for any defendant to take the plea offer." United States v. Reina-Rodriquez, 468 F.3d 1147, 1158-59 (9th Cir. 2006), overruled in part on other grounds by United States v. Grisel, 488 F.3d 844 (9th Cir. 2007).  It is simply not unreasonable to refuse to give a defendant the more lenient sentence the government had offered in a plea agreement but defendant had rejected.  United States v. Vasquez-Landaver, 527 F.3d 798, 805 (9th Cir. 2008) (recognizing the "necessary corrolary of plea bargaining that defendants who go to trial may receive greater sentences than similarly situated defendants who do not).

### 3.   "Quince" Was Defendants' Friend

Having failed to convince the jury that a nefarious man named Quince was responsible for their sex trafficking activities (as well as the Court, which excluded a duress defense based on Quince's alleged control of the defendants), defendants again raise the specter of Quince in order to shift blame at sentencing.  Defendant Miriam claims she was forced by Quince to become a prostitute and was under his control.  (Miriam Brief at 3).  Defendant Angela maintains that Quince (aka Fernando Reyes) was the "mastermind and organizer of the Valenzuela prostitution activities" and that she worked for him and 18th Street gang members "under threat of death and serious harm to herself and children."  (Angela Brief at 17).  Defendant Maribel claims that

68

after her mother Sonia was deported, Quince told her she would
have to work as a prostitute to pay off Sonia's debts, and
characterizes the relationship as "servitude to 'Quince'"
(Maribel Brief at 4, 11, 14).  Even defendant Gabriel joins the
chorus by explaining that he was "threatened with death" by
Quince if he did not leave Miriam alone.  (Gabriel letter to
Court at 2).

     All of this blame-shifting to Quince rings false, and the
testimony at trial exposes it to be so.  At trial, it was
revealed that Quince was simply a man who loaned money to the
defendants.  (Tr. at 2083, 2152-53, 2430).  The record is replete
with evidence that: (1) Gladys was not afraid of Quince (Tr. at
1470, 1786, 2350-51, 2609), Gladys was friendly with Quince (Tr.
at 1172, 1345, 1935, 1975-76, 2589-91, 2784-85), and Gladys would
joke and laugh with Quince (Tr. at 1172, 1243, 1470, 1786, 1935,
2152-53, 2648, 2654); (2) Miriam was not afraid of Quince (Tr. at
583, 1173, 1470), Miriam was friendly with Quince (Tr. at 1935),
and Miriam would joke with Quince (Tr. at 1173); (3) Angela was
not afraid of Quince (Tr. at 1470), and Angela would joke around
with Quince (Tr. at 1470, 2654, 2648); and (4) Maribel was not
afraid of Quince (Tr. at 1173, 1470), and Maribel would joke and
laugh with Quince (Tr. at 1173, 1470).  Indeed, most telling was
the manner in which Maribel would often greet Quince:

     Q:   And how would Maribel greet Quince sometimes?

     A:   When she'd see him, she'd run toward him and jump
          on top of him, opening her legs there on the patio
          at the house.

     Q:   Like a hug?

     A:   Yes.

(Tr. at 1786.)  Defendant Gabriel's newly asserted claims of Quince's purported reign of terror likewise cannot be credited. Defendant Gabriel continued to work alongside defendant Miriam in the business of forced prostitution of minors, but Quince never harmed defendant Gabriel as he had supposedly threatened to do.[35]

The defendants' renewed claims at sentencing that Quince is responsible for their despicable acts must be ignored.  However, the Court should take into account these claims for what they really demonstrate -- that the defendants are unrepentant and take no real responsibility for their acts to this day.

### 4. Anonymous Victim Impact Statements Are Properly Considered by the Court at Sentencing

Victim impact statements are properly considered by the Court in determining a just and fair sentence for the crimes of conviction.  See, e.g., United States v. Santana, 908 F.2d 506, 507 (9th Cir. 1990) ("We have recently upheld the use of victim impact statements for sentencing in non-capital cases.").

The victims who gave the statements contained in the PSRs were two of the victims who testified in this case.  (E.g., Angela PSR at ¶¶ 61-64).  That alone is sufficient for the Court to consider them, and the fact that the specific identify of each victim is not revealed is immaterial.  See United States v. Doe, 488 F.3d 1154, 1158 (9th Cir. 2007) ("At the first sentencing hearing, Doe objected to paragraphs 45-53 on the ground that the

---

[35]    The irony and hypocrisy of defendant Gabriel's claim cannot be ignored.  In his sentencing paper, defendant Gabriel places full blame on the Vasquez Valenzuela women for controlling and directing the activities of "Men(dez)."  And yet in the same breath, he attempts to paint these women as victims of some other man named Quince.

1   victims were not identified.  The court explicitly resolved this
2   dispute when it overruled Doe's objections.").

3        Defendant Angela argues that the effect of withholding the
4   identities of the victims is that the identities of the victims
5   who did not provide a statement would also not be disclosed, and
6   defendant Gabriel claims that he may not have had contact with
7   the victims who provided those statements.  (Angela Brief at 10;
8   Gabriel Brief at 12).  This argument misapprehends the law.  It
9   is immaterial whether the victims who made those statements are
10  ones closely connected to each defendant or not -- both are
11  properly considered by the Court for all defendants where all
12  defendants are convicted of the same conspiracy.  See United
13  States v. Monaco, 852 F.2d 1143, 1150 (9th Cir. 1988) ("Because
14  Frank Monaco pled guilty to the conspiracy count of the
15  indictment, the fact that he or his criminal activities is not
16  described in the letters does not bar their consideration by the
17  court in making its sentencing decision.  His participation in
18  the conspiracy to defraud contributed to the victims' losses.
19  Accordingly, the court did not err in considering the victim
20  impact letters.").

21       The PSR indicated that the identities of the two victims'
22  who gave a statement were not disclosed in order to protect their
23  safety and privacy.  (Angela PSR ¶ 61).  Though the ten victims
24  did testify at trial, they testified to facts that were relevant
25  to defendants' guilt.  The more sensitive and emotional matters
26  that are relevant for sentencing were not necessarily relevant
27  for trial purposes, for example the emotional impact of
28  defendants' crimes on a victim's daughter.  (E.g., Angela PSR

¶ 64).  The victims should not be forced to identify themselves such that they reveal, for example, which of them are undergoing therapy.  (<u>E.g.</u>, Angela PSR ¶ 63).  Despite their public testimony at trial, this is precisely the justification for withholding their identities that defendant Gabriel ignores.  (Gabriel Brief at 12).

Defendant Gabriel claims he cannot "challenge the validity" of the statements made by the victims, thereby depriving him of due process.  (Gabriel Brief at 12).  He does not articulate what that due process violation might be, where he has had the opportunity to cross examine each of the victims at trial to test their credibility, and it is established that defendants are not entitled to cross examine at sentencing the victims who gave those statements.  <u>See</u> <u>United States v. Petty</u>, 982 F.2d 1365, 1370 (9th Cir. 1993) (holding that the "Confrontation Clause does not apply at sentencing to preclude a court from considering hearsay evidence," and that due process requires only that "hearsay bear some minimal indicia of reliability in order to be considered at sentencing").  The defendants cannot articulate any prejudice they suffer from not knowing the identity of the victims who submitted impact statements, and the statements should be considered by the Court.

**B.**   **<u>Miscellaneous Claims by Raised Each Defendant</u>**

   **1.**   **<u>Defendant Gladys</u>**

Defendant Gladys admits that she "expects a severe sentence" (Gladys Brief at 15), and she deserves one.  She should receive the recommended by the Sentencing Guidelines and USPO.  For all the reasons set forth in the government's Omnibus Sentencing

Position, a sentence of life imprisonment is warranted due to the truly egregious nature of defendant Gladys's offense and the particularly heinous manner in which she carried it out.   The arguments in defendant Gladys's sentencing position do not alter that conclusion, and are addressed in more detail above.   A life sentence does not constitute an unwarranted disparity.   (See Section III.A.2)   The Sentencing Guidelines here provide for a sentence that is sufficient but not greater than necessary.   (See Section III.A.1).

The attached letters from defendant Gladys's son and school counselor do not provide a basis for a reduced sentence.   The letters indicate that defendant Gladys's son is doing quite well away from his mother, perhaps better than he would have fared living in a household where his parent figure permitted him to sleep with young girls against their wills.   (Gladys PSR ¶¶ 23, 39).

Accordingly, over defendant Gladys's objections, the Court should impose a term of life imprisonment.

### 2.   Defendant Miriam

Defendant Miriam's primary plea for leniency is based on an interview with hired-gun social worker Rafael Angulo, who provides little more than a filter for defendant Miriam's own unsubstantiated claims of victimization and lack of culpability. Mr. Angulo, who is not a psychiatrist, conducted no scientific testing or evaluation of defendant Miriam.   Instead, he appears to have interviewed defendant Miriam three times, and merely parrots back defendant Miriam's claims -- having made no effort to evaluate the veracity of her claims, much less interview any

73

1  other witnesses, interview the victims, or even review the trial

2  transcripts.

3       Notably, Mr. Angulo interviewed defendant Miriam after the

4  PSR had been disclosed.[36]  The extent of defendant Miriam's

5  troubled history as told to the USPO was having a controlling

6  father and vague memories of having been touched inappropriately

7  as a child, although she did not know by whom.  (Miriam PSR

8  ¶ 125).  Not surprisingly, after learning that these claims had

9  not persuaded the USPO to recommend leniency, when defendant

10 Miriam met with Mr. Angulo a month later, her personal story of

11 abuse had became more detailed and exaggerated.  She told Mr.

12 Angulo that her father sexually abused her from the age of 8 to

13 13, described the abuse in detail, and had suddenly become a

14 victim of human trafficking herself.  (Angulo Report at 2-3).

15 She told Mr. Angulo that she herself was a victim of "Quince"

16 (Angulo Report, p. 4), a claim that was demonstrably proven false

17 at trial.  (See Section III.A.3).  She told Mr. Angulo that she

18 herself worked as a prostitute up to December 20, 2006, and that

19 she merely "allowed" Sandra/Vanessa and Karina/Alicia to

20 prostitute themselves.  (Id.).  These claims are also entirely

21 inconsistent with the evidence at trial.  Because Mr. Angulo's

22 psycho-babble is based entirely on a false account of events

23 provided by defendant Miriam, it should be disregarded entirely.

24 To the extent that the court is inclined to grant any weight to

25 Mr. Angulo's report, the government requests the opportunity to

26

27

28 _____

        [36]Miriam's PSR was disclosed on June 9, 2009.  (Miriam PSR,
   page 1).  Mr. Angulo interviewed her three times between July 8
   and 18, 2009.  (Angulo report, p. 1).

1   cross-examine Mr. Angulo at the sentencing hearing.

2        Defendant Miriam also relies on a study by Philip Zimbardo
3   to provide an explanation of the "situational factors" (otherwise
4   known as excuses) that caused her to behave inhumanely.  Mr.
5   Zimbardo defines evil as "intentionally behaving -- or causing
6   others to act -- in ways that demean, dehumanize, harm, destroy,
7   or kill innocent people." (Zimbardo Report, p. 2).  With the
8   exception of killing, this definition describes defendant
9   Miriam's conduct precisely.  But defendant Miriam's request for
10  lenience and understanding omits a key step towards redemption:
11  acknowledgment of wrong-doing.  Defendant Miriam has never
12  accepted responsibility for her offense (and continues to blame
13  Quince and the victims for her plight), much less demonstrated
14  remorse for the extreme harm she inflicted on others.
15  Accordingly, she has not demonstrated any basis for leniency.

16       **3.   Defendant Angela**

17            **a.   Factual Objections**

18       As a general matter, defendant Angela misapprehends the
19  meaning of relevant conduct for sentencing in this case that
20  involves a conviction of conspiracy among other substantive
21  counts.  Defendant Angela's contentions with facts in the PSR
22  relate almost exclusively to whether defendant Angela performed
23  certain acts.  In some cases she did do those very acts, and
24  evidence establishing that is set forth below.  But for all of
25  defendant Angela's contentions, at least some members of the
26  conspiracy _did_ do them, and given defendant Angela's
27  participation in the conspiracy, they were foreseeable to her.
28  Therefore defendant Angela's factual objections are misleading

and misplaced, and all should be overruled.  In short, the Court
should consider the conduct not only of defendant Angela but also
the conduct of other defendants who participated in the
conspiracy in which she willingly joined.  This is discussed in
greater detail below, but is a consistent flaw in defendant
Angela's (and others') arguments.

Paragraph 14:

Angela objects to the fact that Alejandra had not attained
the age of 14.  However Alejandra's birth certificate, filed as
Under Seal Ex. B, establishes that she was thirteen during part
of the conspiracy, and the undisputed testimony of her mother
does as well.  (Tr. at 1134).  The fact that the jury did not
find Alejandra's age beyond a reasonable doubt does not change
the Court's ability to sentence defendant based on the evidence
proving that fact by a preponderance of the evidence.  See United
States v. Shryock, 342 F.3d 948, 989 (9th Cir. 2003) (rejecting
defendant's argument that the court applied the incorrect
guideline "because the jury did not return any findings that the
murder predicate acts were in the first degree," where the court
found that it was by a preponderance of the evidence).

Paragraph 24:

Angela objects to a finding that she used co-defendant
Cristina or other co-conspirators in Guatemala to recruit and
entice victims to come to the United States, and a finding that
Angela spoke to victims in Guatemala by phone to promise them
legitimate jobs.  Alejandra and Norma both testified that they
had spoken to Morales who had lured the victims with promises of
a legitimate job --either working in a lamp factory or as a baby

76

sitter, and Norma talked to Angela while Norma was still in
Guatemala once she had departed on her trip to the United States.
(Tr. at 888-90, 985-88).  Angela had pressured co-defendant
Morales to recruit girls from Guatemala and had, in fact, been on
the phone with Morales while Morales recruited Alejandra, and
therefore participated in using Morales to recruit Alejandra.
(Tr. at 1431-34).  Furthermore, Angela's only objection is that
she herself did not use Cristina or others to bring the victims
to the United States, not that other defendants did not.  (Angela
Brief at 6).  There is ample evidence that other defendants used
other defendants and co-conspirators -- such as Cristina, Chepe,
Narcy, Tio, and Johanna -- to recruit and entice young females to
come to the United States, to which Angela does not object and
all of which Angela is accountable for under the applicable
standard for relevant conduct.

Angela objects to a finding that she sent money to pay for
the cost of smuggling victims into the United States.  (Angela
Brief at 6).  It is undisputed that it was not the victims but
defendants who paid for the victims to be smuggled into the
United States, and even if Angela did not send the money herself,
her co-defendants did.  (E.g., Tr. at 425, 537, 691).
Regardless of whether Angela herself sent the money, which is the
only thing to which Angela objects, she told her victims that
they owed her for smuggling them to the United States.  (Tr. at
899, 995).

Angela objects to a finding that she was the leader and
organizer of her own sub-group of criminal activity, or that she
directed the conduct of her brother Armando and boyfriend

77

Armando.  (Angela Brief at 6).  Alejandra testified that it was Angela that gave her instructions about how to attract customers, that Angela decided how much to charge the customers, that she was working for Angela, and that the other victims were working for Angela.  (<u>E.g.</u>, Tr. at 1014-17).  It was clear that Angela was in a position of authority over the group of defendants and victims operating from her apartments.  (<u>See</u> section II.E.7).

There is furthermore plenty of evidence to illustrate that all defendants worked together.  (<u>See</u> Angela Brief at 7).  Just by way of example, multiple defendants would meet newly enticed victims when the coyotes brought them to the United States, beat Esperanza, and tracked down Tania when Tania first tried unsuccessfully to escape.  Defendant Angela does not challenge any of those facts, each of which support a finding of concerted action.

<u>Paragraph 25</u>:

Defendant Angela objects that there is insufficient evidence that she rented or arranged for others to rent apartments or motel rooms in Los Angeles.  (Angela Brief at 7).  Co-defendant Morales testified that Angela told her to rent the apartment where defendants would take the victims and clients for prostitution, and that Angela paid the rent for that apartment.  (Tr. at 1463-64).

Angela objects that there is insufficient evidence that she transported or arranged others to transport victims and prostitution customers to apartments or motels.  (Angela Brief at 7).  Both Alejandra and Norma testified that she did.  (Tr. at 908, 1012-13).

78

<u>Paragraph 26</u>:

Angela objects that there is no evidence that she assisted any other defendant in the operation of a prostitution business. (Angela Brief at 7).  Again, she would accompany other defendants when newly enticed victims were delivered by the coyotes in Los Angeles, and she, along with other defendants, tracked down Tania when Tania first tried unsuccessfully to escape.

Angela objects that she did not sell a young female (perhaps because she considered Kathy "so old").  (Angela Brief at 7). Though Kathy did not work for Angela as Kathy thought she would, and was transferred to Gladys who had advanced some of the money for Kathy's smuggling into the United States (Tr. at 1913-18), Angela takes no issue with the fact that other defendants also sold and transferred victims between each other, which conduct is imputed to her.

Defendant Angela states that she did not take part in the beating of a victim. (Angela Brief at 7).  The PSR does not state specifically that Angela specifically helped beat Esperanza after she was unsuccessful at escaping, though that is not necessary because this conduct is imputed to defendant Angela as well.

<u>Paragraph 27</u>:

Defendant Angela claims she did not threaten anyone but Alejandra and Norma.  (Angela Brief at 7).  Angela acknowledges that there is evidence in the form of sworn testimony that she threatened Alejandra and Norma.  (Angela Brief at 7).  She does not dispute that other defendants also threatened other victims. Norma's testimony supports this finding, regardless of the fact

1  that the jury did not reach a unanimous verdict on Count Twelve

2  (and they did convict Angela of Count Thirty-Three).

3  <u>Paragraph 28</u>:

4  Angela objects that there is insufficient evidence that she

5  locked a victim inside her house "and this evidence is

6  omissible," though she fails to offer a reason why it is

7  "omissible." (Angela Brief at 7).  She bases this challenge on

8  the fact that Alejandra and Norma had been able to use cell

9  phones and were contacted by law enforcement in October of 2006

10  but did not reveal that they were threatened and forced to work

11  as prostitutes.  First, there was a lock on the doors of

12  defendant Angela's apartment (Tr. at 913-14, 1031; Gov. Trial Ex.

13  108).  Second, both Alejandra and Norma had testified that Angela

14  had threatened them, and that those threats were made

15  specifically to include if Alejandra or Norma ever spoke to the

16  police about what Angela was doing to them.  (Tr. at 904, 1008-

17  09, 1125-26).

18  <u>Paragraph 29</u>:

19  Angela objects that there is no evidence Angela threatened

20  co-defendant Morales because she was pleading guilty, had

21  visitors urge her to withdraw her guilty plea, or was involved in

22  telling her that people who cooperate get killed or that

23  something would happen to her child.  (Angela Brief at 8).

24  Though the Court excluded evidence of this at trial (Tr. at

25  1684), it was documented in discovery produced to defendants,

26  which is attached hereto.  (Exs. G, H, I).  Furthermore, Angela's

27  objection is that Flor Morales Sanchez could have declined to go

28  to the visiting area when the persons bearing these threats came

to see her.  (Angela Brief at 8).  Though this objection
contemplates that Flor Morales Sanchez was prescient and knew the
reason those people wanted to visit her, it does not undercut
Flor Morales Sanchez's account of what was communicated to her.

Paragraph 40:

Defendant Angela objects that Kathy having thought Angela
would pay the smugglers does not implicate Angela in her
importation into the United States.  (Angela Brief at 9).  Kathy
testified, however, that it was Angela's sister-in-law Johanna
who had told Kathy about working at a restaurant or a clothing
store in the United States, and that she thought she would be
working for Angela.  (Tr. at 1912-15).

Paragraph 44:

Angela objects that Norma did not talk to her "prior to
departing for the United States."  (Angela Brief at 9).  The PSR
states that "Norma had spoken with Angela while still in
Guatemala" (Angela PSR at ¶ 44), and Norma testified that she
spoke to Angela while Norma was in Huehuetenango, which was after
she had departed from her home town but is still in Guatemala.
(Tr. at 890).  There is no factual discrepancy between the
testimony and the PSR.  Whether Angela forced Norma to work as a
prostitute that first night that or not, it is undisputed that
she did force Norma to have sex with men for money by threatening
her.  (E.g., Tr. at 898).

Paragraph 45:

Angela objects to the factual finding that Norma was not
allowed to keep any of the money that she earned because Norma
did send some money home to her family.  (Angela Brief at 9).

This is not a disputed matter:  Norma had to turn all of the money she was paid for being a prostitute to Angela or one of the co-defendants that worked for her, and on occasion, Angela decided to send some money to Norma's family.  (Tr. at 902, 920).  As a practical matter, these payments served to eliminate suspicion that may have arisen with Norma's family in Guatemala.

Paragraph 48:

Angela objects that it distorts the evidence to find that Angela "found" Tania, and that Angela was only present when some of her family members went to a residence.  (Angela Brief at 9).  It is undisputed that Angela was there, along with Gladys, Maribel, Blanca, and Armando, and that Tania left with Gladys.  (Tr. at 1749-51).  The purpose of the trip was to get Tania from the place where she had been hiding and bring her back to work.  That Angela participated in the retrieval of Tonia shows her participation in the overall conspiracy and her connection other defendants and victims.

Paragraph 58:

Angela objects to the sufficiency of the evidence establishing that Alejandra was 13 years old in 2006.  (Angela Brief at 9).  The government addressed the same objection in its response to Angela's PSR paragraph 24, supra.

Paragraph 59:

Angela objects to the fact that she kept all the money that Alejandra earned.  (Angela Brief at 9).  Alejandra testified that the money her customers paid either went directly to Angela, or if Alejandra received the money, she then paid it to Angela or a co-defendant working for Angela.  (Tr. at 1016).  Angela offers

no contradictory evidence.

Angela again objects to the sufficiency of the evidence establishing that Alejandra was 13 years old in 2006, which is addressed in the government's response to paragraph 24 of Angela's PSR, supra.

Angela objects to the fact that Alejandra was locked in the apartment at night. (Angela Brief at 9-10). The government set forth the evidence showing that Angela did keep her victims, including Alejandra, locked in the apartment in response to Angela's objection to paragraph 28 of her PSR, supra, and regarding application of the enhancement for physical restraint. In addition to physical locks, the victims felt trapped by the threats Angela made against them and their families. Angela acknowledges that there is testimony that she threatened to harm Alejandra's grandmother and used witchcraft to scare Alejandra. (Tr. at 1001-03). A bare claim that her testimony was "afflicted" is insufficient to undermine the evidentiary support for a factual finding that she had done each of those things.

Paragraph 60:

Angela objects to the introduction of Alejandra's birth certificate as evidence of her age. (Angela Brief at 10). As discussed above in Section II.E.2, the birth certificates were not introduced at trial because the government did not seek to do so, but are admissible at sentencing. Furthermore, Alejandra was lured to the United States by Morales, but clearly at Angela's behest, as Angela was present for the conversation on speakerphone when Flor Morales Sanchez enticed Alejandra to come to the United States. (Tr. at 1434).

Therefore the Court should overrule all of defendant Angela's objections to the facts set forth in her PSR.

### b. The Nature and Circumstances of Defendant Angela's Offense Are Aggravating

The government set forth the aggravating nature and circumstances of defendant Angela's offense in Part II.B.1.C. of the government's omnibus sentencing position, and will not repeat them in full here.  Suffice it to say that defendant Angela led other co-defendants, physically locked her victims in her apartment, threatened the safety and lives of her victims and their families, took special measures to ensure she could continue to force a thirteen-year-old girl into prostitution for her, went with other co-defendants to track down a victim who escaped, and tried to obstruct justice in the adjudication of this case.

Defendant Angela argues that her conduct did not involve "kidnapping, transport in closed containers or locked trucks." (Angela Brief at 23).  The Court should consider the grotesque features of what defendant Angela did do, not what other crimes exist in the realm of possibility, and those features have been set forth repeatedly in detail.  That the victims were familiar with the defendants and their family members in Guatemala is an aggravating factor, illustrating the abuse of trust in which they engaged; it is not a mitigating factor as defendant Angela argues.  (Angela Brief at 23).  Defendant Angela's claim that most of the victims expected to work as prostitutes in the United States or had been prostitutes in Guatemala is false.  (Angela Brief at 23).  The majority of the victims in this case believed

they were going to be legitimately employed and had not been prostitutes in Guatemala.

Defendant Angela claims that the victims "could have walked away" when SA Palomino performed a welfare check on Angela's apartment in October 2006, and that Norma and Alejandra had access to a cell phone. (Angela Brief at 23). She blinks the obvious fact, to which the victims testified, that the threats under which the victims lived trapped them in defendants' control even to the extent they occasionally were not physically bound in defendants' apartments. The threats made on the victims' families in Guatemala forced them to continue working for defendants -- and the connection between defendants and their families with the victims and their families in Guatemala made that threat real.

Defendant Angela submitted a self-serving, un-verified psychiatric report by Manuel Saint Martin, M.D., J.D. along with her sentencing position. Much of the psychiatric report simply serves as a vehicle for putting purportedly mitigating facts before the Court. The majority of those facts are irrelevant or contradicted by the evidence at trial and otherwise. To the extent they bear on any of defendant's conduct in this case, however, they are not before the Court with the same safeguards, neutrality, or verification as the facts contained in the PSR, in particular because defendant has not made herself available to the USPO. Therefore the psychological report should be given no weight.

For example, the report claims to reach a "diagnosis" of alcohol dependence and major depression. (Report at 4). That

"diagnosis," however, appears to be based on little more than the fact that Angela told him that she first drank alcohol when she was twelve years old, and that she had not had any alcohol and was receiving anti-depressant "treatment" at MDC.  (Report at 4). In other words, the report does not base its conclusion on a thorough, first-hand evaluation of defendant Angela, rather it bases its conclusions on defendants' own word and generalities. The report does, however, show that defendant Angela's cognitive abilities and her judgment appear to function normally, and therefore there is nothing about her psychological profile that mitigates her conduct.  (Report at 3-4).

Most troubling, however, is that defendant has the audacity to cast herself as a victim by putting facts into the report that portray her in a position like that of the victims.  Angela claims she worked for Quince, who would send money to her family in Guatemala for her children, and that she had to turn all of her money over to Quince.  (Report at 2).  As set forth above, Quince never held that role for any of the defendants, and there is <u>no</u> evidence from trial or otherwise that he did.  Angela's attempt to show that she was victimized should be rejected by the Court and viewed as her continued refusal to accept responsibility or to be forthright with the Court.

The United States Probation Office is charged with collecting, investigating, verifying, and synthesizing the facts pertinent to the defendant and his conduct.  "[W]hen interviewing a defendant about his personal history and characteristics: the probation officer is responsible for gathering all pertinent facts about the defendant and the offense, <u>verifying the</u>

information gathered, interpreting and evaluating the data,
applying the facts to the advisory guidelines and statutes, and
presenting the information in an organized, objective report."
United States v. Horvath, 522 F.3d 904, 911 (9th Cir. 2008) (Bea,
J., dissenting from denial of rehearing en banc) (quoting The
Presentence Investigation Report, Office of Probation and
Pretrial Services (Rev. March 2006)) (brackets omitted).

As discussed in greater detail in section III.A.3. Quince
was nothing more than a friend and a business partner for
defendants' family business.  He did not coerce them to force
anyone else into prostitution.

**c.   Defendant Angela's History and Characteristics
Warrant No Leniency from the Court**

Defendant Angela points out that she is 30 years old, was
born in Guatemala, is the daughter of co-defendant Albertina
Vasquez Valenzuela, aka Cristina, and has three sons in the
United States and one in Guatemala.  (Angela Brief at 23).  She
also claims she had "no youthful guidance, has been an alcoholic
since the age of 12, and was raised in a bordello by her mother,"
and suffers from depression.  (Angela Brief at 24).

None of the information set forth in defendant Angela's
pleading or the psychiatric report were verified by the USPO
because defendant Angela would not be interviewed by the USPO,
despite multiple notifications by the USPO.  (PSR ¶ 135).
Defendant Angela does not take issue with that fact.

Defendant Angela submitted six letters to the Court.  Of
those six letters, five are in Spanish and were not translated,

and therefore cannot and should not be considered by the Court.[37]
The one letter that is in English only states that defendant
Angela is "a good person and friend" and a "dedicated mother."
The letter itself says only that its author, Mr. Areco, knew
defendant Angela for a long time, but does not disclose in what
capacity, how he has observed these attributes, nor has he given
any other traction into Angela's attributes.  There is nothing
mitigating in the boilerplate language offered to the Court in
Mr. Areco's letter.

> **d.   Defendant Angela's Conduct Continued After the Mandatory Minimum Became Effective**

Defendant Angela argues that the government did not present
sufficient evidence that she "committed any acts in violation of
18 U.S.C. § 1591 after the effective date of the amended 18
U.S.C. § 1591, which was July 26, 2006."  (Angela Brief at 18);
see Adam Walsh Child Protection and Safety Act of 2006, Pub. L.
109-248, 120 Stat. 587, 615 (July 27, 2006).

The evidence is uncontested that Alejandra, the victim on
which defendant Angela's conviction on Count 17 is based, was
forced to be a prostitute daily from right after she arrived in
Los Angeles until the police rescued her in December of 2006.
Alejandra testified that she worked as a prostitute "[e]very day"
for the whole time she worked for Angela, which ended in December
of 2006, (Tr. at 1017, 1033-34, 1037), and Angela is charged with

---

[37]     Of those five letters, three of them -- the ones signed
by Brenda Guzman, Cintia Guzman, and Matilde Barrios -- appear to
be identical and written in the same handwriting except for the
signature.  This obviously calls into doubt whether anything
contained therein is a genuine account of each of those
individuals' knowledge of defendant Angela as opposed to a
scripted paean.

1    substantive conduct that spanned from February 2006 to December

2    2006 in Count 17 of the Second Superseding Indictment.[38]   There

3    the record is unequivocal that defendant Angela continued her

4    offense conduct after effective date of the statute for

5    approximately five months, and there is no _ex post facto_ issue.

6              **e.   Defendant Angela Does Have Criminal History**

7         Defendant Angela objects that the PSR states that she "has

8    not engaged in other criminal conduct" and that she has not

9    previously been arrested.  (Angela Brief at 16).  The USPO did

10   not identify any criminal history for defendant Angela (Angela

11   PSR at ¶ 130), though the government had produced in discovery a

12   document that shows that a person who resembled defendant Angela

13   was convicted of prostitution and being an unlicensed driver.

14   (Ex. J).  The government does not object to the Court adjusting

15   defendant Angela's Criminal History, and taking account of the

16   fact that defendant Angela used an alias during the time relevant

17   to the offense.

18   _____

19        [38]   See _generally_ _United States v. Kubick_, 205 F.2d 1117,
     1129 (9th Cir. 1999) ("It is well settled in this circuit that 'a
20   statute increasing a penalty with respect to a criminal
     conspiracy which commenced prior to, but was continued beyond the
21   effective date of the statute, is not ex post facto as to that
     crime,' and that '[c]onspiracy is a continuing offense, which is
22   charged and punished as one crime from beginning to end.  The
     crime of conspiracy is entirely separate from the completed
23   substantive offenses committed pursuant to the conspiracy, and it
     is appropriately punished as a separate offense.'  In _Inafuku_,
24   the defendant raised an ex post facto challenge to aggregation of
     amounts of contraband distributed before and after the effective
25   date of a mandatory minimum sentencing statute that turned on the
     amount of methamphetamine involved in the conspiracy.  We held
26   that applying the standards in effect at the point at which the
     conspiracy terminated, in order to punish the defendant for
27   conspiracy to distribute the entire amount of contraband actually
     involved in the conspiracy, does not violate the prohibition
28   against ex post facto laws." (citation to _United States v._
     _Inafuku_, 938 F.2d 972, 973-74 (9th Cir.1991) omitted)).

                                89

Defendant Angela's conviction for prostitution results in one criminal history point pursuant to U.S.S.G. § 4A1.1(c), and because it reveals that she was on probation for 24 months beginning in 2005, she was therefore on probation at the time of the instant offense, which results in an additional two criminal history points pursuant to U.S.S.G. § 4A1.1(d).[39]   Though the USPO concluded that Angela was a Criminal History Category I, taking into account the conviction that defendant Angela calls to the Court's attention, the Sentencing Table in Chapter 5, Part A of the Guidelines shows Angela is a Criminal History Category of II.   This still yields a Guidelines sentence of life imprisonment.

### f.   A Sentence of Life Imprisonment Is Reasonable

Defendant Angela argues that the advisory guidelines sentence is unreasonable.  (Angela Brief at 20).  Defendant Angela offers no reasons why a sentence of life imprisonment is unreasonable, under the Guidelines or otherwise.  That defendant chose to proceed to trial resulted in a significant amount of additional evidence developed through live testimony from the victims and witnesses of defendants' conduct.  For the reasons set forth above, the Guidelines sentence has been properly determined at life imprisonment for defendant Vicente, and for the reasons set forth in Part II in the government's omnibus sentencing position concerning the nature and circumstances of the offense, a sentence of life imprisonment is a fair and just

---

[39]   Because being an unlicensed driver appears to have been punished by no more than five days in jail or twelve months probation, it is not counted for Criminal History purposes under the Guidelines pursuant to U.S.S.G. § 4A1.2(c)(1).

sentence under 18 U.S.C. § 3553(a).

**4.  Defendant Maribel**

Defendant Maribel ultimately seeks a sentence far below the recommended Guidelines sentence of life imprisonment (or even the 30-year sentence recommended by the USPO), namely, "a concurrent sentence not to exceed the mandatory minimum for the conviction of 18 U.S.C. 1591(a)(1)," which the government presumes to be a request for a 15-year sentence.[40]  In support of this extraordinary request for leniency, defendant Maribel asserts several grounds that she styles as requests for downward departures, specifically: aberrant behavior, family circumstances, sentencing disparity, and a so-called combination of factors.  (Maribel Brief at 12-20).  As discussed above in Section III.A.2., any purported sentencing disparity is not a compelling or appropriate basis for leniency here.  As for the remaining grounds, these leniency requests -- whether viewed as downward departures or variances from the Guidelines, see United States v. Mohamed, 459 F.3d 979 (9th Cir. 2006) (treating Guidelines "departures" and post-Booker discretionary decisions to sentence outside the advisory Guidelines as the same) -- likewise do not justify any leniency for defendant Maribel, whether considered alone or in concert.

---

[40]    Unlike her co-defendants, defendant Maribel is not subject to a 15-year mandatory minimum sentence for her particular § 1591 conviction (Count 13), because her sex trafficking conviction was for conduct pre-dating the July 2006 change in the statute that added the mandatory minimum.  (Compare Maribel PSR ¶ 147 with Gladys PSR ¶ 180).

### a.  __Maribel's Year Long Sex Trafficking Activities Were not Aberrant Behavior__

Defendant Maribel claims that she is entitled to leniency because her involvement in the sex trafficking conspiracy from at least December 2005 through the end of 2006 (see PSR ¶¶ 45, 45), constituted aberrant behavior.  While "[a] single act of aberrant behavior may be a mitigating circumstance" justifying leniency at sentencing, __United States v. Fairless__, 975 F.2d 664, 667 (9th Cir. 1992), this is not such a case.

In support of her claim, defendant Maribel emphasizes that she had no contact with law enforcement prior to 2005.  (Maribel Brief at 14).  Furthermore, defendant Maribel claims that, after her mother Sonia was deported, she was forced by "Quince" to work as a prostitute to repay her mother's debts.  (Maribel Brief at 14).  Defendant Maribel also claims that her work as a prostitute was "at the direction and encouragement of the co-defendants." (Maribel Brief at 14).

None of these factors justify lenience for aberrant behavior.  To begin with, the absence of prior convictions does not alone support such leniency.  __United States v. Takai__, 941 F.2d 738, 743 (9th Cir. 1991).  Moreover, as discussed in Section III.A.3 above, the claim that Quince was responsible for the defendants' sex trafficking cannot be credited.  Furthermore, even if it were true that Quince played a role in causing defendant Maribel to begin work as a prostitute, that fact would in no way justify or excuse her conduct in turning around and forcing others to work as prostitutes.  Finally, and more to the point, defendant Maribel's year long participation in forcing

92

girls to work as prostitutes was simply not aberrant.  In defining the contours of an aberrant behavior departure, the Ninth Circuit has explicitly found that it is not aberrant behavior for a defendant to have engaged in hundreds of overt acts over a prolonged period of time.  <u>Fairless</u>, 975 F.2d at 667.

Here, from at least December 2005 through the end of 2006 defendant Maribel engaged in act after deliberate act in furtherance of the Vasquez Valenzuela family business.  Defendant Maribel initially forced Esperanza to work as a prostitute and later beat her.  She also arranged for the importation of Tania and forced her to work as a prostitute through the use of threats.  Defendant also had girls named Lucy, Carol and Marlene working for her.  As Tania best put it, the more she was forced to work as a prostitute, Maribel worked less.  (Tr. at 1732). This lengthy period of deliberate action designed to make money for Maribel off the suffering of others was by no means the type of spontaneous, single episode of out-of-character criminal conduct that deserves leniency.  <u>See</u> <u>United States v. Lam</u>, 20 F.3d 999, 1003 (9th Cir. 1994); <u>see, e.g.</u>, <u>Fairless</u>, 975 F.2d at 667-68 (finding aberrant behavior for one-time bank robbery based on a "convergence of factors," including the fact that it was defendant's first criminal offense, it was a "complete shock" to defendant's friends and family, and defendant suffered from manic depression, was suicidal, purposefully used an unloaded gun, had lost his job and was under extreme pressure from various circumstances); <u>United States v. Takai</u>, 941 F.2d 738 (9th Cir. 1991) (upholding aberrant behavior departure where defendants, who were otherwise admirable law-abiding people, engaged in an

"naive" and "unreflective" effort to obtain green cards by bribing an INS official over a 8-day period).

Simply put, defendant Maribel's crime was not aberrant; it was abhorrent.

### b.  Defendant Maribel's Family Circumstances are not Extraordinary

Sentencing leniency based on family circumstances is specifically discouraged by the Sentencing Guidelines.  See U.S.S.G. § 5H1.6 ("Family ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.").  The Ninth Circuit has held that because the factor is specifically discouraged by the guidelines, "the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." United States v. Klimavicius-Viloria, 144 F.3d 1249, 1267 (9th Cir. 1998).  In that vein, the Ninth Circuit has also noted that the Sentencing Commission "considered family ties, was aware that those ties could be affected by prison sentences, and declared that family ties ordinarily should not be a factor in departing from Guideline Sentences." United States v. Berlier, 948 F.2d 1093, 1096 (9th Cir. 1991).  The Ninth Circuit makes clear that "[p]ermissible downward departures generally involve situations where the defendant is an irreplaceable caretaker of children, elderly, and/or seriously ill family members, and the extent of the departure appropriately serves to protect those family members from the impacts of the defendant's prolonged incarceration." United States v. Leon, 341 F.3d 928, 931 (9th

94

Cir. 2003) (emphasis in original).

Nonetheless, defendant Maribel argues that she should receive leniency at sentencing due to family circumstances she believes are extraordinary because: (1) she is the mother of two minor children, ages 8 and 11 months; (2) she was the sole means of support for the infant prior to her arrest in September 2008; (3) the 8 year old is with his father Cesar Augusto Gordillo; (4) the infant is with Los Angeles County foster care; and (5) she has had to rely on others to care for her minor children. (Maribel Brief at 16).  These factors, however, do not demonstrate that defendant Maribel is irreplaceable.  To the contary, they demonstrate that she is not.

By her own admission, defendant Maribel's children are being cared for -- the eldest by his father and the youngest by Los Angeles County foster care.  Defendant Maribel also concedes that she is able to "rely on others" for the care of her children. Moreover, although she uses her children as a weapon to invoke sympathy at sentencing, there is strong reason to believe that defendant Maribel's maternal instincts are not as she portrays them in her sentencing paper.  For example, after she learned that law enforcement was looking for her in December 2006, defendant Maribel became a fugitive and left her older son behind in the care of her brother.  (Ex. O at 1).[41]  Indeed, on the date of her arrest, defendant Maribel was found with a man other than the child's father and admitted that she had been living with him

---

[41]    This incident also demonstrates that defendant Maribel is far from irreplaceable, because other family members can and will take care of her children.

for weeks.  (Ex. L).  Finally, according to her sister-in-law, when her oldest son was under defendant Maribel's care, a social worker had come looking for defendant Maribel because she had not been taking her son to school.  (Ex. M at 2).

Thus, defendant Maribel's conclusory statement that her continued incarceration will "inflict serious hardship on the minor children" and have a "disastrous effect on the children's upbrining" must be rejected out of hand.  The very cases cited by defendant Maribel amply demonstrate that she has not made the required showing that the effects of her imprisonment would be any more detrimental to her family than the ordinary case in which a parent is sentenced to a lengthy term of imprisonment. Cf. United States v. Galante, 111 F.3d 1029, 1035 (2d Cir. 1997) (upholding departure where family unit "would probably be destroyed" by defendant's incarceration); United States v. Haversat, 22 F.3d 790, 797 (8th Cir. 1994) (defendant's incarceration would be "potentially life threatening" to his wife who suffered from "severe psychiatric problems"); United States v. Gaskill, 991 F.2d 82 (3d Cir. 1993) (defendant was sole provider for mentally ill wife); United States v. Pena, 930 F.2d 1486, 1494-95 (10th Cir. 1991) (defendant was sole provider for herself, a 2-month child, a 16-year old daughter, and the baby of the 16-year old).  Frankly, the record demonstrates that defendant Maribel's children may be better off in the care and custody of others.

Accordingly, any leniency based on defendant Maribel's family circumstances is unwarranted here.

    **c.**   **Defendant Maribel's Agreement to be Deported has No Meaning**

In <u>United States v. Cruz-Ochoa</u>, 85 F.3d 325 (8th Cir. 1996), the Court recognized that a sentencing judge could depart downward from the guidelines on the basis of the defendant's waiver and consent to administrative deportation.  Here, defendant Maribel indicates that she "is willing to consent to an administrative deportation," (Maribel Brief at 18), and on this basis believes that her sentence should be reduced.

Defendant Maribel's offer is meaningless.  Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act provides that any alien convicted of an aggravated felony shall be deported.  8 U.S.C. § 1227(a)(2)(A)(iii).  The instant convictions for sex trafficking undeniably constitute aggravated felonies.  See 8 U.S.C. § 1101(a)(43)(K).  Even defendant Maribel concedes that it is "wholly expected that defendant will be returned to Guatemala." (Maribel Brief at 18).  Thus, defendant Maribel offers no consideration for the sentencing leniency she now requests.

Accordingly, the Court should reject defendant Maribel's request for sentencing leniency based on her hollow offer to consent to deportation.  Furthermore, for the reasons explained by the government in its Omnibus Sentencing Position, a shorter prison term in exchange for deportation would run contrary to the command of § 3553(a) that the sentence protect the community, as it would merely hasten defendant Maribel's ability to inflict harm upon the young girls of Guatemala and the United States after her deportation.

###### d.   No Combination of Factors would Justify a More Lenient Sentence

As a last resort, defendant Maribel seeks leniency under the theory that the factors she has identified may justify a shorter sentence when viewed in combination.  They do not.  Rather, for the reasons set forth by the government in its Omnibus Sentencing Position -- including the Guidelines recommendation of life imprisonment, the serious and egregious nature of the offense, and defendant Maribel's heartless personal characteristics -- a life sentence is warranted, and no combination of factors can mitigate against such an appropriate and just sentence.

The attachment of letters by defendant Maribel and certain family members does not change that conclusion.  Moreover, the reliability of the representations in those letters is suspect. In her letter to the Court, defendant Maribel notes that she has "repented of all my sins" and given her life to Christ.  But fundamental to repentance is the acknowledgment of the underlying sin and acceptance of the consequences.  In that same letter, defendant Maribel instead offers an excuse for her sex trafficking activities -- "gang members were forcing me to pay them a certain type of money I couldn't pay them."  Not only does this excuse suggest a lack of genuine repentance, but it is false.  As discussed above in Section III.A.3, there is no showing that Quince forced the defendants to do anything, and, as driver Juan Montes testified at trial, one did not have to pay the gang members anything if one did not work as a prostitute. (Tr. at 2085-86).  Defendant Maribel further offers the excuse that "I did not want my sons to stay without a mom."  But as

noted above, when fleeing from law enforcement officers seeking
to arrest her sex trafficking activities, defendant Maribel took
no issue with abandoning her son.

Defendant Maribel also submits a letter from her brother
Pedro, who describes her as a loving sister who took care of him.
But before the need to paint defendant Maribel in this light for
purposes of sentencing arose, Pedro testified under oath before
the grand jury that he was "never close" with his sister and that
he "grew apart from pretty much everybody" in his family. (Under
Seal Ex. F).  Indeed, Pedro also told investigating agents that
he had thrown Maribel out of the house at 125 Mountain View
because he "was ashamed of what they were doing" as prostitutes.
(Ex. N at 3).  Indeed, perhaps most telling about the true
feelings of her family members, there is no letter from Pedro's
wife Leyci, who defendant Maribel had threatened to force into
prostitution if victim Tania ever escaped while Leyci was around.
(Tr. at 1742).

For all these reasons, defendant Maribel is undeserving of
any sentencing leniency from the recommended term of life
imprisonment.

### 5. <u>Defendant Gabriel</u>

#### a. <u>Life Imprisonment Does Not Violate the Eighth Amendment for Defendants Sex Trafficking Convictions Involving Ten Victims</u>

Defendant Gabriel argues that a sentence of life
imprisonment for his sex trafficking convictions involving the
rape and attempted rape of three of the victims is cruel and
unusual punishment because he had not previously been convicted
of a crime.  (Gabriel Brief at 4).  Though defendant Gabriel's

acts were clearly cruel and unusual, a punishment of life
imprisonment is commensurate with his criminal acts.

This Court repeatedly has "held that, '[o]utside of the
death penalty context, the Eighth Amendment is offended only by
sentences that are 'grossly disproportionate' to the crime.'"
United States v. Gomez, 472 F.3d 671, 673 (9th Cir. 2006)
(quoting United States v. Aquilar-Muniz, 156 F.3d 974, 978 (9th
Cir. 1998)) (emphasis added); see also United States v. Zavala-
Serra, 853 F.2d 1512, 1518 (9th Cir. 1988) (explaining that "the
proportionality requirement of the [E]ighth [A]mendment does not
require that defendant's sentence be harmonized with sentences
imposed by other courts on other defendants."). "Generally, as
long as the sentence imposed on a defendant does not exceed
statutory limits, this [C]ourt will not overturn it on Eighth
Amendment grounds." United States v. Parker, 241 F.3d 1114, 1117
(9th Cir. 2001); accord United States v. Albino, 432 F.3d 937,
938 (9th Cir. 2005) (per curiam); Gomez, 472 F.3d at 673.

The Ninth Circuit, like most federal courts of appeals,
treat Justice Kennedy's concurring opinion in Harmelin v.
Michigan, 501 U.S. 957 (1991), a plurality decision, as the
governing Eighth Amendment standard for evaluating cruel and
unusual punishment claims. See Andrade v. California, 270 F.3d
743, 754 (9th Cir. 2001), reversed on other grounds, Lockyer v.
Andrade, 538 U.S. 63 (2003).

In reviewing an Eighth Amendment cruel and unusual
punishment challenge to a sentence imposed, the court is first
required to determine whether a comparison of the gravity of the
defendant's offense to the harshness of the penalty raises an

inference of "gross disproportionality."  See Andrade, 270 F.3d at 757 (citing Harmelin, 501 U.S. at 1005 (Kennedy, J., concurring)); Andrade, 538 U.S. at 72.  Only if such an inference is raised, should the court proceed to the second and third factors of analysis, which require an intrajurisdictional and interjurisdictional comparison.  Id.[42]; Harmelin, 501 U.S. at 1005 (Kennedy, J., concurring)  "[A] reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate."  Harmelin, 501 U.S. at 1004 (Kennedy, J., concurring) (quoting Solem v. Helm, 463 U.S. 277, 290 n. 16 (1983)).  Like most cases, this case does not even present the inference of "gross disproportionality" required to begin an extended Eighth Amendment analysis.  See Andrade, 270 F.3d at 754.

"As Harmelin makes clear, simply because a sentence is harsh does not mean that it is disproportionate to the crime."  Andrade, 270 F.3d at 759.  The punishment must be evaluated in light of the gravity of the offense in order to determine whether there is an inference of "gross disproportionality."  Id.

In Harmelin, the Supreme Court found no violation where the defendant had been sentenced to life imprisonment (without the

---

[42]  In those instances where an inference of "gross disproportionality" is raised, courts are to engage in an examination of sentences imposed on other criminals in the same jurisdiction and the sentences imposed for commission of the same crime in other jurisdictions.  Solem v. Helm, 463 U.S. 277, 292 (1983).  Though the Supreme Court in Andrade reversed the Ninth Circuit on the grounds of its standard of review and its ruling that the California Court of Appeal's affirming that a sentence of two consecutive terms of 25 years to life in prison was not grossly disproportionate, the Supreme Court did not reverse the Ninth Circuit's analysis, including this aspect.

possibility of parole) for possession of more than 650 grams of cocaine, despite the fact that it was the defendant's first felony offense.  501 U.S. at 994-96, 1002.  There, Justice Kennedy relied on the fact that the crime at issue "threatened to cause grave harm to society" and found no inference of gross disproportionality.  Id. at 1002.

It cannot seriously be argued that operating a sex trafficking business and raping some of the victims himself is less serious than possessing in excess of 650 grams of cocaine. Given that the latter was not grossly disproportionate to a life sentence in Harmelin, the former is not here.

Defendant Gabriel, who raises this argument, claims he had not previously been convicted of a crime and had a limited role in these offenses.  Defendants were responsible for recruiting at least ten girls from Guatemala and forcing them into involuntary prostitution under use of force, and threats of force and death to them and their families.  In reality, defendant Gabriel, along with defendant Miriam, was the jailor of the victims who lived at the Kingsley house, and raped two of the victims there and tried to rape a third.  His participation lasted months, and he lived off the excess of their criminal enterprise with the comfort of a nanny for their kids and stopped keeping a steady job.  His repugnant conduct justifies -- and by no means is grossly disproportionate to -- a sentence of life imprisonment.

### b.  Defendant Gabriel is Not Being Punished for Falling in Love

Defendant Gabriel's mantra at sentencing is that his only "crime" is having fallen in love with a prostitute.  The evidence

102

at trial, however, demonstrated that defendant Gabriel had indeed committed a number of real crimes -- forcing the victims to prostitute themselves, locking them in the at night, threatening them, driving them to find prostitution customers, collecting the proceeds of their forced prostitution, and raping them.  It is difficult to see how any of these actions fall under the umbrella of falling in love with a prostitute.

Defendant has yet to acknowledge his wrong-doing or express remorse for his crimes.  The most he has acknowledged is that "I made mistakes" and "[t]he situation escalated."  Although he claims to be "truly sorry for my conduct," these apologies ring hollow without some recognition of what that conduct was. Defendant Gabriel cannot even bring himself to acknowledge that there are ten victims in the case; he insists instead on calling them the "Prostitution Recruits," as if they are volunteers in an army of sexual service providers.  In complete defiance of the evidence at trial and the jury's verdicts and special findings, defendant Gabriel maintains that the "Prostitution Recruits <u>claim</u> they did not know they were entering the United States illegally to work as prostitutes for the Valenzuela [w]omen, and <u>claim</u> to have been forced to work as prostitutes against their will." (Gabriel Brief at 3) (emphasis added).  Like defendants Miriam and Maribel, without any recognition of his wrongful conduct, defendant Gabriel's "apologies" amount to nothing more than regrets that he got caught.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.**

**CONCLUSION**

For all the foregoing reasons, the court should impose on each of defendants Gladys, Miriam, Angela, Maribel, and Gabriel a sentence of lifetime imprisonment, a five-year term of supervised release, and the respectively applicable mandatory special assessments.